# EXHIBIT A TO
# NOTICE OF REMOVAL

# MARY ANN MORENO v.
# CIRCLE K STORES, INC.
# (State Court Case No. 2022CV30949)

| | DATE FILED: August 12, 2022 3:10 PM |
|---|---|
| DISTRICT COURT, JEFFERSON COUNTY<br>STATE OF COLORADO<br>100 JEFFERSON COUNTY PARKWAY<br>GOLDEN, CO 80401 | FILING ID: 45F598C53C15F<br>CASE NUMBER: 2022CV30949 |
| **MARY ANN MORENO**,<br><br>Plaintiff,<br><br>v.<br><br>**CIRCLE K STORES, INC.,**<br><br>Defendant. | ▲ COURT USE ONLY ▲ |
| *Attorneys for Plaintiff:*<br><br>Nicholas A. Lutz, #51299<br>Iris Halpern, #53112<br>RATHOD \| MOHAMEDBHAI LLC<br>2701 Lawrence Street, Suite 100<br>Denver, CO 80205<br>(303) 578-4400 (t) / (303) 578-4401 (f)<br>nl@rmlawyers.com<br>ih@rmlawyers.com | Case No:<br>Division: |
| **COMPLAINT AND JURY DEMAND** ||

Plaintiff Mary Ann Moreno, by and through her attorneys Nicholas A. Lutz and Iris Halpern of RATHOD | MOHAMEDBHAI LLC, respectfully alleges for her Complaint and Jury Demand as follows:

1

## I.   NATURE OF THE CLAIMS

Plaintiff Mary Ann Moreno ("Ms. Moreno") alleges that Defendant Circle K, Inc. ("Defendant") wrongfully and outrageously terminated her employment after she exercised her right to self-defense and self-preservation during an armed robbery while at work.

## II.   PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Mary Ann Moreno was and is a resident of the State of Colorado and is domiciled in Adams County.

2. At all relevant times, Defendant Circle K, Inc., was and is a business entity incorporated under the laws of the State of Colorado, doing business in the Adams County, Colorado.

3. This Court has jurisdiction over this matter pursuant to C.R.S. § 13-1-124.

4. Venue is proper pursuant to C.R.C.P. 98(c), as the allegations contained herein occurred within Adams County.

## III.   FACTUAL ALLEGATIONS

5. Plaintiff Mary Ann Moreno is the mother of two children, a son, Brandon Moreno, and a daughter, Olivia Roan. She is currently 74 years of age.

6. Ms. Moreno raised her children in a loving home in the suburbs of Denver, where, by all accounts, they enjoyed an ordinary and happy childhood. Both Brandon and Olivia remain close to Ms. Moreno and continue to live in Colorado to this day.

7. Ms. Moreno maintains an especially close relationship with her daughter-in-law, Bonnie Moreno, whom she often refers to as her "bonus child," as she grew up with Ms. Moreno's children, passing the time on the same playgrounds and streets.

2

8. Ms. Moreno has worked hard to support her family throughout her entire life. At just sixteen years old, Ms. Moreno started her first job as a retail cashier in a local shop.

### Ms. Moreno's Employment with Defendant Circle K, Inc.

9. For most of sixteen years, Ms. Moreno was employed as a cashier for Circle K Sheridan, located at 9489 Sheridan Boulevard in Westminster, Colorado.

10. In her time with Circle K, Ms. Moreno was perpetually hard working and dedicated to her job.

11. As an employee, Ms. Moreno was timely, efficient, and attentive to her customers and the store.

12. Though her official title was that of "cashier," Ms. Moreno attended to almost all of the day-to-day duties required to operate the store.

13. Among these, she operated the register, restocked products, cleaned and sanitized the store area and restrooms, assisted customers with operating the fuel pumps, and generally maintained the premises.

14. Ms. Moreno rarely hesitated to cover shifts for other employees, and she was asked to do so on a regular basis.

15. In fact, it was not uncommon for Ms. Moreno to miss family events such as holidays and birthdays in order to cover shifts at Circle K Sheridan.

16. Ms. Moreno also acted as a de facto store manager, though she retained the title and hourly pay of a cashier. By all accounts, she frequently ran the store single-handedly.

17. Despite the fact that Circle K's Sheridan store was located in a relatively high-crime area, Ms. Moreno was often called upon by Circle K to work the store alone, without the assistance of another employee or manager, including during night shifts.

18. Throughout her incredibly long tenure – nearly sixteen years – with Circle K, Ms. Moreno was never disciplined nor given a negative performance review.

19. Ms. Moreno's dedication to her job and to Circle K was never merely financial. At the time Circle K terminated her, the company was paying her $14.05 per hour.

### *Ms. Moreno was Attacked by a Knife-Wielding Assailant During an Armed Robbery*

20. On October 4, 2020, Ms. Moreno worked her usual evening shift at Circle K Sheridan. She was 72 years old at the time.

21. As was often the case, Ms. Moreno was the only employee scheduled to work that evening.

22. Ms. Moreno acted as the cashier and otherwise supervised the store. She restocked products, cleaned and sanitized where needed, and assisted her customers with their business.

23. At approximately 7:00 p.m., while Ms. Moreno stood alone behind the front counter, a man walked through the front door of the store.

24. Ms. Moreno immediately noticed that the man appeared disheveled and was not behaving normally.

25. The man advanced towards the front of the counter as Ms. Moreno stood behind it.

26. Ms. Moreno immediately noticed that the man was carrying two large hunting knives in his hands.

27. Ms. Moreno called out to the man that he could not bring knives into the store.

28. The man ignored Ms. Moreno and approached the counter.

29. The man then demanded a pack of cigarettes. Ms. Moreno asked the man which brand he would like, and then retrieved the cigarettes from the display case behind her.

30. As Ms. Moreno began to ring up the man's apparent purchase, the man told Ms. Moreno words to the effect of, "just give them to me for free."

31. Ms. Moreno replied that she could not give the man the cigarettes for free because she did not own the store and could lose her job.

32. The man then became visibly upset and began to leave the store.

33. As he left, however, he abruptly changed directions and came back toward Ms. Moreno from the side and rear of the counter.

34. Ms. Moreno exclaimed to the man, "Don't come back here!" referring to the closed area behind the counter in which she was standing.

35. However, the man proceeded towards Ms. Moreno and the display case containing the store's tobacco products.

36. As the man was blocking Ms. Moreno's only avenue of escape from the closed area behind the counter, she was unable to flee.

37. The man moved towards Ms. Moreno and well within reaching distance of her, still holding the knives.

38. Nearing closer to Ms. Moreno, the man then suddenly reached his arm out past her for a pack of cigarettes in the display case the two were standing directly adjacent to.

39. Ms. Moreno instinctively reached out towards the man to protect herself and prevent the man from coming closer toward her and the merchandise.

40. Ms. Moreno was terrified for her life as she genuinely believed that the man was going to attempt to stab or otherwise harm her.

41. She had no means of escape from the area. Nor did she have any idea what the man intended to do after invading the small area that she was trapped in.

42. Fortunately, after grabbing the cigarettes from the display case, the man rushed out of the store.

43. At least one customer witnessed the robbery and called the Westminster Police Department. Several more customers entered the store in the moments immediately following the robbery.

### *Police Arrived at the Scene Shortly After the Assailant's Departure*

44. After the assailant had fled the store, Ms. Moreno picked up the phone and began calling other Circle K employees to notify them about the robbery and ask for help.

45. Several customers remained at the store and tried to comfort Ms. Moreno.

46. Officers from the Westminster Police Department arrived a short time after the assailant had fled the store.

47. The officers contacted Ms. Moreno immediately after they arrived and asked her to provide a statement.

48. Ms. Moreno was incredibly distraught while speaking with the officers.

49. Ms. Moreno was crying and struggling to concentrate when giving her account of the incident.

50. Ms. Moreno was obviously and apparently in extreme distress.

51. Ms. Moreno told officers what had happened and how scared she was when the assailant started walking towards her with the knives.

52. Despite the fact that Ms. Moreno had reached out to multiple Circle K employees so that she could be relieved of her shift, none immediately responded. Ms. Moreno was forced to continue working.

53. Indeed, Ms. Moreno called at least three Circle K Sheridan managers for assistance, none of whom agreed to provide immediate help nor demonstrated any genuine concern for Ms. Moreno's well-being.

54. Ms. Moreno called her daughter-in-law, Bonnie Moreno, to tell her the news of the robbery. Bonnie Moreno arrived at the store shortly after to comfort Ms. Moreno while she waited for another Circle K employee to arrive.

55. Store Manager Love Jorgensen and Circle K District Manager Dris Armand arrived at the store later in the evening.

56. Mr. Armand immediately began interrogating Ms. Moreno about the armed robbery.

57. Mr. Armand then went to the back office in Circle K Sheridan.

58. Mr. Armand turned his attention to the security module to watch surveillance from the time of the robbery.

59. The surveillance footage captured the armed robbery from many different angles.

60. Mr. Armand became upset with Ms. Moreno and insisted to her that the surveillance footage did not depict a robbery and that the apparent thief had not actually been armed.

61. Mr. Armand told Ms. Moreno that Circle K Sheridan would be investigating the incident due to her "push[ing] [the assailant]" away when the assailant approached her in a threatening manner while armed with a knife.

62. Mr. Armand also demanded that Ms. Moreno's daughter-in-law leave the store "for [her] own safety."

63. Ms. Moreno's daughter-in-law was forced to exit the store.

### *Ms. Moreno was Fired Two Days After Being Robbed at Knifepoint*

64. The day after the robbery, Ms. Moreno called Ms. Jorgensen to inquire about her schedule for the following week.

65. Ms. Jorgensen informed Ms. Moreno she needed to call Mr. Armand to discuss her schedule.

66. Ms. Moreno then called Mr. Armand. However, Mr. Armand refused to discuss Ms. Moreno's schedule, citing the fact Ms. Moreno was purportedly still under investigation as a result of the robbery.

67. Ms. Moreno asked why she was under investigation and Mr. Armand responded with words to the effect of, "You know what you did wrong."

68. Mr. Armand continued to dismiss Ms. Moreno's confusion and place blame on her for being attacked at work.

69. Mr. Armand relentlessly insisted that Ms. Moreno apologize for "her behavior."

70. However, Ms. Moreno refused to apologize for having been the victim of a crime.

71. Mr. Armand abruptly ended the conversation after becoming frustrated and told Ms. Moreno to call him the following day.

72. As instructed, Ms. Moreno called Mr. Armand the next day.

73. Mr. Armand told Ms. Moreno that Circle K Sheridan was terminating her employment, effective immediately.

### *The Assailant Was Identified and Arrested by the Westminster Police Department*

74. The Westminster Police Department identified and arrested Tyler Darren Wimmer as Ms. Moreno's assailant.

75. Mr. Wimmer was charged with multiple felonies, including aggravated robbery and menacing with a deadly weapon.

76. While his criminal case was pending, Mr. Wimmer was deemed incompetent to participate in the proceedings or assist with his own defense. As such, he was sent to a medical treatment facility to be rehabilitated.

77. Mr. Wimmer's mental state provides evidence for why Ms. Moreno reasonably believed he would attempt to stab her based on his erratic behavior.

### *<u>The Robbery and Termination from Circle K Caused Ms. Moreno Emotional Distress</u>*

78. Ms. Moreno has experienced devastating effects as a result of being terminated through no fault of her own after nearly two decades of work at Circle K.

79. Ms. Moreno is experiencing symptoms of anxiety such as inability to focus and forgetfulness, and she is often unable to sit still.

80. Since her termination, Ms. Moreno has become isolated from her friends and family.

81. Ms. Moreno's grandchildren have noticed that Ms. Moreno has begun swiftly and severely deteriorating, both mentally and emotionally, since Circle K terminated her employment.

82. When Circle K terminated Ms. Moreno, if effectively severed her closest ties to her community, her most significant social sphere, and ultimately, her sense of purpose and direction.

83. Since Circle K terminated her employment, Ms. Moreno has been forced to seek regular psychological counseling for the first time in her life.

84. Though she has since found another cashier position with a different company, Ms. Moreno still panics while working at her new cashier position.

85. She also fears for the security of her job and primary income, which she feels could be jeopardized at any time through no fault of her own.

86. Ms. Moreno is also fearful of conversations and ordinary interactions with her supervisors, as she feels she might be terminated at any time.

### *Circle K's Termination of Ms. Moreno Caused Her Substantial Economic Loss*

87. Though Ms. Moreno is now successfully reemployed, she is earning far less than she earned in her position with Circle K.

88. Ms. Moreno's new position also offers far less generous benefits than she was entitled to while employed with Circle K, causing her to incur substantial out-of-pocket costs for services that were previously covered by insurance.

89. Ms. Moreno's new position does not offer her a pension, which was a significant financial benefit attending her position at Circle K.

## IV.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Wrongful Discharge in Violation of Public Policy

90. Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

91. Defendant terminated Ms. Moreno in violation of public policy as set forth under Colorado common law.

92. The essence of the public-policy exception to at-will employment status is that an employee has a cognizable claim for wrongful discharge if the employee contravenes a clear mandate of public policy. *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 107 (Colo. 1992).

93. Claims for wrongful discharge under Colorado's public-policy exception have included termination of employee for (1) refusal to participate in illegal activity; (2) the employee's refusal to forsake the performance of an important public duty or obligation; (3) the employee's refusal to forego the exercise of a job-related legal right or privilege; (4) the employee's whistle

blowing activity or other conduct exposing the employer's wrongdoing; and (5) the employee's performance of an act that public policy would encourage under circumstances where retaliatory discharge is supported by evidence of employer's bad faith, malice, or retaliation. *Lorenz*, 823 P.2d at 107.

94. The public policy at issue must be clearly mandated such that the acceptable behavior is concrete and discernible, as opposed to a broad hortatory statement of policy that gives little direction as to the bounds of proper behavior. *Rocky Mountain Hosp. and Medical Service v. Mariani*, 916 P.2d 519, 525 (Colo.1996). Colorado courts have held that expressions of public policy are readily found in statutes, common law, and the state constitution. *Id.*; *Slaughter v. John Elway Dodge Sw./AutoNation*, 107 P.3d 1165, 1169 (Colo. App. 2005) (considering Colorado constitution as a source of public policy). From such sources, it is clear that Colorado has long recognized the right of self-defense and self-preservation as an essential public policy.

95. It is also equally clear that Colorado has recognized the rights of victims and witnesses to report and testify about crimes. Hence, in C.R.S. § 18-8-706, state statute makes it unlawful for an individual to commit retaliation or anticipatory retaliation a victim or witness of crime. Likewise, C.R.S. §24-4.1-303 requires "all reasonable attempts shall be made to protect any victim…from harm, harassment, intimidation, or retaliation arising from cooperating in the reporting, investigation, and prosecution of a crime." Such law further states that "[a]n employer may not discharge or discipline any victim…for participating in the preparation of a criminal proceeding." From such sources, a victim's right to report a crime and participate in its investigation and prosecution are recognized as an essential public policy.

### Examples of Sources of Public Policy

96. According to Article II, § 3 of the Colorado Constitution, "All persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives . . . and of seeking and obtaining their safety and happiness."

97. Similarly, the Colorado Constitution also recognizes self-defense as one of the bases for Colorado's right to bear arms. Colo. Const. Art. II § 13 ("The right of no person to keep and bear arms in defense of his home, person and property . . . shall be called in question."). Following the ratification of the state constitution, the common law right of self-defense was recognized by Colorado courts as early as 1886. *See Kent v. People*, 8 Colo. 563 (1886); *Ritchey v. People*, 23 Colo. 314 (1896) (recognizing the common law right to self-defense and its limitation via the "retreat to the wall" doctrine).

98. Today, the right to self-defense is also codified in Colorado's criminal code. *See* C.R.S. § 18-1-704. According to the self-defense statute, a person shall not be held criminally liable for using physical force against another person "in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person." *Id.*

99. Because the right to self-defense is enshrined in the Colorado constitution, has been long recognized in Colorado's common law, and is written into the Colorado Criminal Code, it is a source of public policy sufficient to support Ms. Moreno's wrongful discharge claim.

100. Ms. Moreno's wrongful discharge claim is also simultaneously grounded in her rights as a victim and witness of a crime, including her rights to report a crime and to participate in the investigation and prosecution of the crime, free from retaliation by her employer or anyone

13

else, in accordance with C.R.S. § 18-8-706, C.R.S. §24-4.1-303, and other statutes, common law, and other sources of public policy as recognized by the courts.

101. Ms. Moreno was the only employee working during the incident which reasonably resulted in her fear of harm with no aid nearby.

102. Ms. Moreno raised up her arm to defend and protect herself from the attacker who had two knives and had aggressively approached and reached toward her.

103. In raising up her arm, Ms. Moreno made contact with the attacker.

104. After making contact with the attacker in attempt to move him away from her and the merchandise, Ms. Moreno immediately moved backwards away from the attacker.

105. The attacker left the Circle K store unharmed and with the cigarettes he intended to steal.

106. All of the above events were visible and apparent from Circle K's surveillance camera footage.

107. Circle K was aware that Ms. Moreno was acting in self-defense and/or self-preservation at the time she reached toward her assailant.

108. By terminating Ms. Moreno for reporting the fact that she was a victim of a violent crime to her managers and for instinctively defending herself against an armed attacker while working alone in a closed space, Circle K violated the public-policy exception to Colorado's at-will employment doctrine.

109. As a direct result of Defendant's actions, Ms. Moreno has suffered significant injuries, damages, and losses to be determined at trial.

110. Defendant's conduct described herein was attended by circumstances of fraud, malice, or willful and wanton conduct, such that Ms. Moreno notifies Defendant now that she intends to move for exemplary damages pursuant to C.R.S. § 13-21-102.

## SECOND CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress and/or Outrageous Conduct

111. Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

112. In Colorado, the elements of outrageous conduct are: (1) the defendant engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) causing the plaintiff severe emotional distress. *See Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2022), *aff'd*, 90 P.3d 228 (Colo. 2004).

113. Defendant Circle K engaged in extreme and outrageous conduct by terminating Ms. Moreno because she was the victim of multiple felonies in the workplace and because she engaged in protected activity by defending herself from potentially severe bodily harm in the workplace.

114. Ms. Moreno did not provoke the violence against her in any way. Rather, she reacted to an armed robber in an instinctual manner to protect her safety.

115. Defendant Circle K engaged in extreme and outrageous conduct by terminating Ms. Moreno for exercising her right to self-defense.

116. Defendant Circle K engaged in extreme and outrageous conduct by terminating Ms. Moreno for reporting the act of criminal violence perpetuated against her on the job to her managers, and for reporting the attack to the police.

117. Defendant Circle K further engaged in extreme and outrageous conduct by refusing to timely come to her aid following the armed robbery or assign additional employees to the store, forcing Ms. Moreno to remain at the scene of the crime, alone, for a substantial period of time.

118. Defendant terminated Ms. Moreno two days after she was the victim of the armed robbery.

119. Defendant Circle K further engaged in extreme and outrageous conduct when it ordered Ms. Moreno's daughter to leave the store following the armed robbery, depriving Ms. Moreno of her only company and source of comfort.

120. Through all of the above conduct, Defendant acted recklessly or with the intent of causing Ms. Moreno emotional distress.

121. Defendant was aware of Ms. Moreno being the victim of an emotionally and psychologically damaging event prior to terminating her for exercising her constitutional right to self-defense.

122. As a result of her termination following a nearly sixteen-year career with Defendant, Ms. Moreno has since experienced severe anxiety, depression, and isolation.

123. As a direct result of Defendant's actions, Ms. Moreno has suffered significant injuries, damages, and losses to be determined at trial.

124. Defendant's conduct described herein was attended by circumstances of fraud, malice, or willful and wanton conduct, such that Ms. Moreno notifies Defendant now that she intends to move for exemplary damages pursuant to C.R.S. § 13-21-102.

V. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Mary Ann Moreno respectfully requests that the Court enter judgment for the following relief:

a. Actual economic damages as established at trial;

b. Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

c. Pre-judgment and post-judgment interest at the highest lawful rate;

d. Appropriate tax-offset, as allowed by law;

e. Attorneys' fees and costs, as allowed by law;

f. Any other appropriate remedy available under law; and

g. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED: August 12, 2022

RATHOD | MOHAMEDBHAI LLC

*s/ Nicholas A. Lutz*
Nicholas A. Lutz, #51299
Iris Halpern, #53112
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400
nl@rmlawyers.com
ih@rmlawyers.com

ATTORNEYS FOR PLAINTIFF