**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-02327-NYW-STV

MARY ANN MORENO,

    Plaintiff,

v.

CIRCLE K STORES, INC.,

    Defendant.

---

**PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT TO SEEK EXEMPLARY DAMAGES REMEDY**

---

Plaintiff, by and through undersigned counsel, hereby moves for leave to amend her operative Complaint and Jury Demand to allow her to pursue exemplary damages against Defendant at trial, and in support thereof, states as follows:

**CERTIFICATE OF CONFERRAL**

Undersigned counsel has conferred with counsel for Defendant. Defendant opposes the relief requested herein.[1]

This case arises from Defendant Circle K's termination of Plaintiff Mary Moreno from her job immediately after Ms. Moreno, then 72-years-old and working alone on the night shift, was

---

[1] Undersigned counsel conferred with opposing counsel regarding this motion several weeks ago and also contacted the Clerk's office to request instructions as to the Court's preferred procedure and timeframe for motions filed pursuant to C.R.S. § 13-21-102. Though undersigned counsel indicated the instant motion was opposed at that time, undersigned counsel omitted a certificate of conferral on the initial filing. *See* ECF No. 36. As such, the Court struck that Motion. *See* ECF No. 38. The same relief is hereby requested in the form of this Motion including the required certificate of conferral.

the victim of an armed robbery at work. Following the robbery, and after Ms. Moreno reported it to the police, Defendant placed Ms. Moreno under an "investigation" and demanded that she apologize to her manager for her conduct during the robbery. When Ms. Moreno refused to apologize, and insisted that she did nothing wrong, Defendant terminated her from her job. Even given the early stages of the discovery process in this case, Plaintiff has ample evidence to make a *prima facie* showing of a triable issue of exemplary damages. Given the *de minimis* requirements for a plaintiff to present an issue of exemplary damages to a jury, Ms. Moreno respectfully requests this Court allow her to amend her Complaint and to pursue exemplary damages at trial against Defendant.

## FACTUAL BACKGROUND

### *Ms. Moreno's Employment with Defendant Circle K, Inc.*

For most of the past sixteen years, Ms. Moreno was employed as a cashier for Circle K Sheridan, located at 9489 Sheridan Boulevard in Westminster, Colorado. *See* Complaint, ECF No. 3, at 3, ¶ 9; Answer, ECF No. 16, at 2, ¶ 9. In her time with Circle K, Ms. Moreno was perpetually hard working and dedicated to her job. *See* **Ex. 1**, *Decl. of B. Moreno* at ¶¶ 6-7. As an employee, Ms. Moreno was timely, efficient, and attentive to her customers and the store. *See id.* In fact, Circle K admits that Ms. Moreno was meeting her performance expectations prior to terminating her. Complaint, ECF No. 3, at 3, ¶ 11; Answer, ECF No. 16, at 3, ¶ 11.

Within Ms. Moreno's job duties, Ms. Moreno operated the register, restocked products, cleaned and sanitized the store area and restrooms, assisted customers with operating the fuel pumps, and generally maintained the premises. Complaint, ECF No. 3, at 3, ¶ 13; Answer, ECF No. 16, at 3, ¶ 13. Ms. Moreno rarely hesitated to cover shifts for other employees, and she was

2

asked to do so on a regular basis. **Ex. 1**, *Decl. of B. Moreno* at ¶ 7; **Ex. 2**, *Decl. of O. Verela Roan* at ¶ 7. In fact, it was not uncommon for Ms. Moreno to miss family events, such as holidays and birthdays, in order to cover shifts at Circle K Sheridan. *Id.* Ms. Moreno's dedication to her job and to Circle K was never merely financial. At the time of Ms. Moreno's termination from Circle K, the company was paying her $14.05 per hour. Complaint, ECF No. 3, at 3, ¶ 19; Answer, ECF No. 16, at 3, ¶ 19.

### *Ms. Moreno was Attacked by a Knife-Wielding Assailant During an Armed Robbery*

On October 4, 2020, Ms. Moreno worked an evening shift at Circle K Sheridan. She was 72 years old at the time. Complaint, ECF No. 3, at 4, ¶ 20; Answer, ECF No. 16, at 4, ¶ 20. Ms. Moreno was the only employee scheduled to work that evening. Complaint, ECF No. 3, at 4, ¶ 21; Answer, ECF No. 16, at 4, ¶ 21. Ms. Moreno acted as the cashier and otherwise supervised the store. She restocked products, cleaned and sanitized where needed, and assisted her customers with their business. Complaint, ECF No. 3, at 4, ¶ 22; Answer, ECF No. 16, at 4, ¶ 22. At approximately 7:00 p.m., while Ms. Moreno stood alone behind the front counter, a man (now known to be Tyler Darren Wimmer) walked into the store. Ms. Moreno immediately noticed that Wimmer appeared disheveled and was behaving abnormally. Wimmer paced aimlessly around the store and eventually advanced towards the front of the counter as Ms. Moreno stood behind it. **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 6:54:52-6:54:58.[2] Ms. Moreno noticed that Wimmer was carrying two large hunting knives in his hands (one of which may have been contained in packaging). *Id.*

---

[2] The video and audio exhibits referenced herein have been conventionally submitted to the Court.

Wimmer set his things down on the counter and asked Ms. Moreno for a pack of cigarettes. Ms. Moreno asked Wimmer which brand he would like, and then retrieved the cigarettes from the display case behind her. Complaint, ECF No. 3, at 5 ¶ 29; Answer, ECF No. 16, at 5, ¶ 29; **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 6:55:18-6:55:56. As Ms. Moreno began to ring up Wimmer's apparent purchase, he told Ms. Moreno words to the effect of, "just give them to me for free." Complaint, ECF No. 3, at 5, ¶ 30; Answer, ECF No. 16, at 5, ¶ 30; **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 6:55:30. Ms. Moreno replied that she could not give him the cigarettes for free because she did not own the store and could lose her job. Complaint, ECF No. 3, at 5, ¶ 31; Answer, ECF No. 16, at 5, ¶ 31; *see also* **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 6:55:35.

Wimmer then became visibly upset and began to leave the store. **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 6:55:56-6:56:09: As he left, however, he abruptly changed directions and lurched back towards Ms. Moreno from the side and rear of the counter. *Id.* at 6:56:09-6:56:10. Ms. Moreno exclaimed to Wimmer, "Don't come back here!" Complaint, ECF No. 3, at 5, ¶ 34; Answer, ECF No. 16, at 5, ¶ 34; *see also* **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 6:55:08. Still, Wimmer proceeded towards Ms. Moreno and the display case containing the store's tobacco products. **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 6:56:10-.6:56:13. As Wimmer was blocking Ms. Moreno's only avenue of escape from the closed area behind the counter, she was unable to flee. *See id.* Wimmer moved towards Ms. Moreno and well within reaching distance of her, still holding the knives. *Id.* Nearing closer to Ms. Moreno, Wimmer then suddenly reached his arm out past her for a pack of cigarettes in the display case the two were standing directly adjacent to. *Id.* Ms. Moreno instinctively flinched and reached out

4

towards Wimmer to protect herself and prevent him from coming closer toward her and the merchandise, pushing him back from what she perceived was him lunging towards her. *Id.* at 6:56:13-6:56:16.

Ms. Moreno was terrified for her life as she genuinely believed that Wimmer, a crazed, drug wielding, erratically behaving man, was going to attempt to stab or otherwise harm her. She had no means of escape from the area. Nor did she have any idea what Wimmer intended to do after invading the small area that she was trapped in. Fortunately, after grabbing the cigarettes from the display case, Wimmer left the store. Complaint, ECF No. 3, at 5, ¶ 30; Answer, ECF No. 42, at 5, ¶ 42; **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 6:56:16-6:56:22. Just after Wimmer fled the store, a customer who had witnessed the robbery and Ms. Moreno called the police. *See* **Ex. 4**, *9-1-1 Call Recording (Witness & Mary Moreno)*.

After contacting the police, Ms. Moreno returned to her post behind the counter. **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 7:02:08. Some customers remained at the store and tried to comfort Ms. Moreno, who was clearly upset. *See, e.g.*, *id.* at 7:03:09. At approximately 7:03 p.m. Ms. Moreno called Circle K employee, and Ms. Moreno's supervisor, Love Jorgensen. *Id.* at 7:04:05. Ms. Moreno explained to Ms. Jorgensen, "Hi, Love. It's Mary. Hey, I had to call the cops. A guy came in here with a big – with a hunting knife. . . ." *Id.* at 7:04:00-7:04:10. Ms. Moreno then explained how she and the store had been robbed. *Id.* at 7:04:10-7:04:36. Officers from the Westminster Police Department arrived at approximately the same time and first spoke with customers. *Id.*; *see also* Complaint, ECF No. 3, at 6, ¶ 46; Answer, ECF No. 16, at 5, ¶ 46. At approximately 7:05 p.m., Ms. Moreno attempted to call Amanda, another Circle K employee to ask about relieving Ms. Moreno from her shift. **Ex. 3**, *Circle K Store Surveillance Video*

5

(Register 1) at 7:05:28-7:06:40. However, there was no answer, and Ms. Moreno left a message explaining that there had been a robbery and asking Amanda to "please come down here." *Id.*

At about the same time, Officer Rebecca Hansen of the Westminster Police Department approached Ms. Moreno behind the register and asked to speak with her. **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 7:05:28-7:06:40; *see also* **Ex. 5**, *Affidavit In Support of Warrantless Arrest*. Officer Hansen later wrote of her interaction with Ms. Moreno, "Mary Ann was visibly shaking as she spoke with me and repeated, 'I'm so scared' several times. Mary Ann said she has been working as a clerk for 17 years and [has] never been so scared." **Ex. 5**, *Affidavit in Support of Warrantless Arrest* at 2. Still, as she spoke with Officer Hansen, Ms. Moreno continued to serve customers at the register. *See, e.g.,* **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 7:09:25-7:10:00. Apparently concerned for Ms. Moreno, Officer Hansen asked if Ms. Moreno's manager, Love Jorgensen, would be coming into the store and how long it would be before she arrived. *Id.* at 7:07:45-7:07:53. Ms. Moreno responded that Ms. Jorgensen had told her she would be at the store in approximately 45 minutes later and that another manager, Amanda, had not answered the phone at all. *Id.* at 07:07:53-07:08:08. When no one had arrived to relive Ms. Moreno from her shift several minutes later, Officer Hansen attempted to call Amanda herself. *Id.* at 7:14:40-7:16:34. As she waited, Ms. Moreno contacted her daughter, Olivia Roan. *See id.* at 7:30:46-7:36:43. Ms. Roan, who was out of town, arranged for Bonnie Moreno, Ms. Moreno's daughter-in-law, to come to the store. *Id.* The officers remained in the area of the store until approximately 7:42 p.m. *Id.* at 7:36:43-7:42:33. Ms. Moreno continued working her shift and Bonnie Moreno arrived at the store at approximately 8:05 p.m. *Id.* at 8:05:10 (Bonnie Moreno appears in a grey/blue shirt, glasses, and a mask).

6

As Ms. Moreno still had not been relieved at that time, Ms. Moreno called Store Manager Dris Aammoud. **Ex. 3**, *Circle K Store Surveillance Video* (Register 1) at 8:10:05-8:11:26. Ms. Moreno told Mr. Aamoud, in relevant part,

> I don't know if you're aware that I got robbed . . . about an hour ago . . . and no one has shown up. . . . I can't even see, I'm so scared, . . . he had a knife as long as my arm. . . . The police wanted somebody down here and nobody showed up and I'm really scared.

*Id.*

Mr. Aamoud arrived at the store just past 8:24 p.m. and approached Ms. Moreno and Bonnie Moreno at the counter. **Ex. 3**, *Circle K Surveillance Video* (Register 1) at 8:24:37-8:24:50 (Mr. Aamoud appears dressed in a blue t-shirt, blue jeans, dark sandals, and a mask). Without wasting time, Mr. Aamoud asked Ms. Moreno what had happened. *Id.* at 8:24:52. Ms. Moreno provided the same account of events that she given to the police, Bonnie Moreno, and numerous customers. *Id.* at 8:24:52-8:25:56. Mr. Aamoud interjected, "But **it's not a robbery**." *Id.* at 8:25:56 (emphasis added). Ms. Moreno insisted (as did the police), that it was indeed a robbery, and Mr. Aamoud stormed to the back office of the store to review the surveillance footage. *Id.* at 8:25:56-8:26:18. Having reviewed the security footage, Mr. Aamoud returned to the counter and began to question Ms. Moreno's account and criticize her response to being victimized. *Id.* at 8:37:34. He told her, "It happened at 7:01 [p.m.]? Because I can't see anything." *Id.* at 8:38:46. He continued to question about the earlier events in a harsh tone as Ms. Moreno became audibly and visibly exasperated. *Id.* at 8:38:46-8:39:50. As Ms. Moreno gestured to demonstrate her reaction to the armed Mr. Wimmer, Mr. Aamoud chastised Ms. Moreno, asking "Why would you push him?" *Id.* at 8:39:55. Ms. Moreno responded, "Because I thought he was going to stab me, I didn't know!" *Id.* Mr. Mr. Aamoud continued to question Ms. Moreno and then threatened, "I'm

7

going to review the whole thing." *Id.* at 8:40:07.  Even during this exchange, Ms. Moreno was apparently expected to continue working the register.  *Id.* at 8:40:07-08:41-15.

Mr. Aamoud then turned to Bonnie Moreno, and asked, "So, you're the daughter?"  and then told her, "You know you can't be here, right?"  **Ex. 3**, *Circle K Surveillance Video* (Register 1) at 8:41:13-8:41:18.  Ms. Moreno and Bonnie insisted that Ms. Moreno should not be left alone at the store, but Mr. Aamoud instructed Bonnie to leave the store immediately.  *Id.* at 8:41:18-8:42:47. Bonnie Moreno acquiesced and then left the store, leaving Ms. Moreno with Mr. Aamoud. *Id.* at 8:43:13. At virtually the same time, Love Jorgensen arrived and approached Mr. Aamoud. *Id.* (Ms. Jorgenson appears at the top left of frame, dressed in all black, with a black mask).  Mr. Aamoud continued to question 72-year-old Ms. Moreno about her recollection of the armed robbery, even sarcastically asking, "So you're telling me, and that's what I want to hear from you, he came back here, he had a knife in his hand, and he grabbed the cigarettes . . . Because I couldn't see it on the video."  *Id.* at 8:43:50-8:44:05.  As Ms. Moreno continued to repeat her story, Mr. Aamoud scolded her in apparent disbelief stating, "I want to see a video that tells me exactly what happened."  *Id.* at 8:44:08-8:44:16.  Ms. Moreno continued to try to explain but her effort was in vain.  Mr. Aamoud returned to the back office to review the video once more.  *Id.* at 8:44:34. Ms. Moreno joined him a few minutes later.  **Ex. 6**, *Circle K Surveillance Video* (Office) at 8:49:50.[3] The two reviewed the footage and discussed its contents for several minutes.  Though there is no audio accompanying this surveillance view, Mr. Aamoud's body-language was plainly aggressive as he cross-examined Ms. Moreno about her conduct during the armed robbery.  *Id.* at 8:49:50-

---

[3] This view from Circle K's surveillance system (as produced by Defendant Circle K) does not contain audio.

8:53:09. Following their conversation, Mr. Aamoud finally sent Mr. Moreno home and told her to call him the next day. **Ex. 3**, *Circle K Surveillance Video* (Register 1) at 8:54:05-8:54:28. Once Ms. Moreno departed the store, Mr. Ammoud and Ms. Jorgenson can be seen and heard joking and laughing about Ms. Moreno and the events of the evening. *Id.* at 8:55:30-8:56:22.

Despite Mr. Aamoud's insistence that a "robbery" had never taken place, Mr. Wimmer was apprehended and ultimately charged with multiple felonies including aggravated robbery while armed with a deadly weapon against an at-risk adult. **Ex. 5**, *Affidavit in Support of Warrantless Arrest* at 2. Since that time, Ms. Moreno has endured her role as a victim and primary witness in the criminal proceedings against Mr. Wimmer, which have been significantly prolonged by the Jefferson County District Court's Order finding Mr. Wimmer incompetent to proceed and committing him to in-patient restoration. **Ex. 7**, *Order Finding Defendant Incompetent to Proceed*.

### *Circle K Fired Ms. Moreno Two Days After She was Robbed at Knifepoint*

Following the robbery, Ms. Moreno called Ms. Jorgensen to inquire about her schedule for the following week. Ms. Jorgensen informed Ms. Moreno that she needed to call Mr. Aamoud to discuss her schedule. Ms. Moreno then called Mr. Aamoud. However, Mr. Aamoud refused to discuss Ms. Moreno's schedule, citing the fact Ms. Moreno was purportedly still under investigation as a result of the robbery. Ms. Moreno asked why she was under investigation and Mr. Aamoud responded with words to the effect of, "You know what you did wrong." Mr. Aamoud continued to dismiss Ms. Moreno's confusion and place blame on her for being attacked at work. Mr. Aamoud relentlessly insisted that Ms. Moreno apologize for "her behavior." However, Ms. Moreno refused to apologize. Complaint, ECF No. 3, at 8, ¶ 70; Answer, ECF No. 16, at 8, ¶ 70. Mr. Aamoud then told Ms. Moreno to call him the following day. Complaint, ECF No. 3, at 8, ¶

9

71; Answer, ECF No. 16, at 8, ¶ 71. As instructed, Ms. Moreno called Mr. Aamoud the next day. As admitted by Defendant, Mr. Aamoud told Ms. Moreno that Circle K Sheridan was terminating her employment, effective immediately. Complaint, ECF No. 3, at 8, ¶ 73; Answer, ECF No. 16, at 8, ¶ 73.

### *The Robbery and Termination from Circle K Caused Ms. Moreno Emotional Distress*

Ms. Moreno has experienced devastating effects as a result of being terminated through no fault of her own after nearly two decades of work at Circle K. Ms. Moreno's family have noticed that Ms. Moreno has begun swiftly and severely deteriorating, both mentally and emotionally, since Circle K terminated her employment. *See* **Ex. 1**, *Decl. of B. Moreno ¶¶* 26-32; **Ex. 2**, *Decl. of O. Verela Roan* at *¶¶* 18-25. According to Bonnie Moreno, "After she was fired, my mother-in-law became a shell of her past self. She immediately became very depressed and anxious and isolated herself from others. To this day, she still has not recovered." **Ex. 1**, *Decl. of B. Moreno* at *¶* 26. According to her daughter-in-law, Olivia Roan, "When Circle K terminated my mother a week after the robbery, she was further traumatized by the abrupt loss of the income, community, and routine she had established during her 16-year career." **Ex. 2**, *Decl. of O. Verela Roan* at *¶* 18.

Since Circle K terminated her employment, Ms. Moreno has been forced to seek regular psychological counseling for the first time in her life. **Ex. 1**, *Decl. of B. Moreno ¶* 29; **Ex. 2**, *Decl. of O. Verela Roan* at *¶* 24. Ms. Moreno has only been able to obtain counseling through the assistance of Jefferson County District Attorney's Office, which has approved her for extended sessions based on her mental and emotion needs following her termination *See* **Ex. 8**, *Crime Victim Compensation Application*; **Ex. 9**, *Crime Victim Compensation Notice*. She has also been forced to request additional sessions and assistance through that program due to the ongoing nature of her

trauma. **Ex. 10**, *Crime Victim Extension Request.* Though she has since found another cashier position with a different company, Ms. Moreno still struggles while working at her new cashier position. **Ex. 1**, *Decl. of B. Moreno* at ¶ 30.

## ARGUMENT

Ordinarily, Fed. R. Civ. P. 15 governs a motion to amend a complaint. Rule 15(a) provides for liberal amendment of pleadings. The Court may grant leave to amend at its discretion. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Viernow v. Euripides Devel. Corp.*, 157 F.3d 785, 799 (10th Cir. 1998). And, "Refusing leave to amend is generally only justified upon a showing of undue delay, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or undue prejudice to the opposing party, or futility of amendment, etc." *Castleglen, Inc. v. Resolution Tr. Corp.*, 984 F.2d 1571, 1585 (10th Cir. 1993). "However, courts in this District have held that § 13-21-102 of the Colorado Revised Statutes, not Federal Rule of Civil Procedure 15 or 16, controls the inquiry when a pleading amendment concerns exemplary damages." *2506 6th St., LLC v. WestGUARD Ins. Co.*, No. 21-CV-01673-WJM-MDB, 2022 WL 17335952, at *3 (D. Colo. Nov. 30, 2022) (collecting cases).

A court may grant request for leave to pursue exemplary damages when a plaintiff bringing an action "for a wrong done to the person or to personal or real property, and the injury complained of" establishes that there is *prima facie* proof of a triable issue that the acts or omissions complained of are "attended by circumstances of fraud, malice, or willful and wanton conduct." C.R.S. § 13-21-102(1)(a), (1.5)(a). "*Prima facie* proof of a triable issue of exemplary damages is established by 'a showing of a reasonable likelihood that the issue will ultimately be submitted to the jury for resolution.'" *Stamp v. Vail Corp.*, 172 P.3d 437, 449 (Colo. 2007) (quoting *Leidholt v.*

11

*Dist. Court In & For City & Cnty. Of Denver*, 619 P.2d 768, 771 n.3 (Colo. 1980)); *see also Schneiderman v. Barry*, No. 2011CV7101, 2013 WL 5508525, at *1 (Colo. Dist. Ct. Jan 7, 2013). At this stage, the plaintiff must only submit "evidence that, unless rebutted, is sufficient to establish a fact." *Stamp*, 172 P. 3d at 449. According to Colorado's Supreme Court, "[a]t the pleading stage, the liberal standard of C.R.C.P. 15 applies." *Schneiderman,* 2013 WL 5508525, at *2.

Furthermore, according to the Court, "[t]his is a lenient standard. A Plaintiff should have an opportunity to test the merit[]s of any claim for relief that is supported by the underlying facts of the case." *Id.* (quoting *Stamp*, 172 P.3d at 450). Importantly, the court is only concerned with "whether the evidence, when viewed in the light most favorable to [the plaintiff, is] sufficient to make out a *prima facie* case of willful and wanton behavior for the purpose of allowing [plaintiff] to amend [her] complaint to include exemplary damages, not whether such evidence is sufficient to defeat a motion for summary judgment or to result in a jury verdict in Plaintiffs favor." *RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, No. 16-CV-1301-PAB-GPG, 2018 WL 3055772, at *4 (D. Colo. May 10, 2018); *see also Amber Properties, Ltd. v. Howard Elec. & Mech. Co.*, 775 P.2d 43, 46–47 (Colo. App. 1988) ("If the evidence, viewed in a light most favorable to the injured party, is such that a jury could find, beyond a reasonable doubt, that injury-causing tortious conduct was attended by circumstances of fraud or malice or a wanton and reckless disregard of the injured party's rights and feelings, then the court is required to submit the question to the jury.").

Section 13-21-102 requires a plaintiff to move to amend the complaint to allege "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct." In the context of C.R.S. § 13-21-102, the Colorado Supreme Court has defined "willful and wanton

conduct" to mean "conduct purposefully committed which the actor must have realized was done heedlessly and recklessly without regard to consequences or the rights of the plaintiff." *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005) (citing *Frick v. Abell*, 602 P.2d 852, 854 (Colo. 1979)). Stated differently, "[w]here the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result, the statutory requirements of C.R.S. § 13-21-102 are met." *Id.* (citing *Pizza v. Wolf Creek Ski Dev. Corp.*, 711 P.2d 671 (Colo. 1985)). And finally, conduct that is considered "vindictive" is conduct that is consistent with an award of exemplary damages. *Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.*, 232 P.3d 277, 286 (Colo. App. 2010).

Ms. Moreno has satisfactorily established a *prima facie* case that Defendant has knowingly engaged in conduct—namely intentionally and maliciously terminating her employment for one of or a combination of the following three reasons, subjecting her to significant emotional distress as a result: (1) because she was the victim of a crime; (2) because she reported the crime to the police; and/or (3) for warding off an attack by a knife-wielding assailant for which she would not apologize—to warrant an exemplary damages instruction. This is not a summary judgement motion, but Plaintiff has nevertheless described above an extensive, non-exhaustive sampling of testimony and documents supporting her motion to amend. The following facts, as documented above, can be readily proven by Plaintiff at trial:

Plaintiff was 72-years old at the time she was robbed at knife point, qualifying her as an at-risk adult under the Colorado Criminal Code. Circle K scheduled Ms. Moreno to work alone on the night shift on the evening she was robbed. Following the robbery, Circle K refused to relieve Ms. Moreno from her shift for an unreasonably lengthy amount of time while forcing her to

13

continue working while they questioned the truthfulness of her account. Circle K employees reviewed the surveillance footage of the robbery after it occurred, and after Ms. Moreno reported the crime to the police. That footage clearly shows that Ms. Moreno was the victim of an armed robbery and did not engage in any wrongful conduct. Rather, Ms. Moreno, upon being cornered by Wimmer and with nowhere to flee, flinched and reached out to ward off Mr. Wimmer, pushing against his arm when she thought he was lunging towards her where she was trapped behind the counter. Ms. Moreno – at age 72 – did not chase, or otherwise attempt to restrain Wimmer or otherwise physically engage with him. She merely instinctively tried to protect herself against a deranged assailant in a sudden, unpredictable, and potentially physically threatening or fatal series of evolving events.

Despite the fact that Ms. Moreno was the victim of a crime, and a particularly vulnerable one at that, Circle K unreasonably blamed Ms. Moreno for the robbery, and demanded that Ms. Moreno apologize, telling her, "you know what you did." When Ms. Moreno declined at her daughter's behest, Circle K terminated her 16-plus year career on the spot. Circle K and its employees were well aware of Ms. Moreno's age and her status as an at-risk adult, the fact that she was the victim of a violent felony on its premises, and Ms. Moreno's deep emotional attachment to her job. Circle K and its employees recklessly disregarded these facts when they terminated her. Importantly, Ms. Moreno need not establish as a matter of law her case for exemplary damages against Defendant at this juncture, only that the evidence, if viewed in a light most favorable to her, results in "a reasonable likelihood that the issue will ultimately be submitted to the jury for resolution." *Stamp*, 172 P.3d at 449. Given such a relaxed standard, "the court is required to submit the question to the jury." *Amber Properties, Ltd.*, 775 P.2d at 46-47. Put in

another way, the Court is not deciding right now whether Ms. Moreno is entitled to exemplary damages, it is merely recognizing her right to request from a jury such damages at trial if the jury finds them warranted. Similar damages are available as a matter of right under other employment statutes.

## CONCLUSION

Plaintiff seeks only the right to seek exemplary damages and punitive damages at trial. The final decision as to the existence and amount of those potential damages is for a jury to make. There is ample evidence to support a prima facie case of malice, wanton, or willful misconduct on the part of Defendant to warrant an exemplary damages instruction. Accordingly, Plaintiff respectfully asks that this Court grant her leave to seek exemplary and punitive damages at trial. Her redlined Amended Complaint is attached hereto as **Exhibit 11**.

Respectfully Submitted: March 30, 2023

RATHOD | MOHAMEDBHAI LLC

*s/ Nicholas A. Lutz*
Nicholas A. Lutz
2701 Lawrence Street, Suite 100
Denver, CO 80205
T: (303) 578-4400
E: nl@rmlawyers.com

ATTORNEY FOR PLAINTIFF