# Exhibit 7

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV
_____

VIDEOCONFERENCE DEPOSITION OF            May 5, 2023
AMY HARVEY
_____

MARY ANN MORENO,

        Plaintiff,

vs.

CIRCLE K. STORES, INC.,

        Defendant.
_____

      The deposition of AMY HARVEY, taken before Leeann Stellor, a Registered Merit Reporter, Certified Realtime Reporter, and a Notary Public in and for the County of Summit and the State of Colorado, via Zoom videoconference, on Friday, May 5, 2023, at the hour of 10:04 a.m.



Page 14

1  that, you can go ahead and answer.  Thanks.
2     A.   Robert Sway was promoted to a different
3  position in Florida, so he ended up leaving the
4  HR director role, and then they brought in someone
5  else to take that place.
6     Q.   And that was Sue Martinez?
7     A.   Yes.
8     Q.   Okay.  And, I mean, did you contact or
9  obtain attorneys at any point in time with respect
10 to this case?
11    A.   I don't understand your question.
12    Q.   Sure.  Let me rephrase it.
13         Are you represented, are you
14 currently represented by any attorneys with respect
15 to this case?
16    A.   Yes.
17    Q.   And who is that?
18    A.   That is Tom and Nick.
19    Q.   Okay.  Did you sign any agreements to be
20 represented by them?
21    A.   No.
22    Q.   And whose idea was it for you to be
23 represented?
24    A.   Well, they contacted me and asked me if I
25 would like them to represent them -- or represent

Page 15

1  me.
2     Q.   Who is paying their attorneys' fees?  Are
3  you doing that?
4     A.   That would be Circle K.
5     Q.   And let me ask about your highest level
6  of education before we go back to talking about kind
7  of your time at Circle K.
8          What's your highest level of
9  education?
10    A.   I completed a bachelor's degree, but I am
11 currently enrolled for my master's.
12    Q.   Master's in what?
13    A.   Human resource management.
14    Q.   Congratulations.
15    A.   Uh-huh.
16    Q.   Always good to get a little extra, couple
17 more degrees under the belt.
18         And when did you begin working at
19 Circle K?
20    A.   2016.
21    Q.   And can I just briefly ask what your
22 position before Circle K was?
23    A.   Before Circle K or when I started with
24 Circle K?
25    Q.   Before Circle K.

Page 16

1     A.   I was a multi-unit manager.
2     Q.   At?
3     A.   At Stripes Convenient Stores in Texas.
4     Q.   And if you could walk me through your job
5  history at Circle K, your job progression, that
6  would be much appreciated.
7     A.   I started as a multi-unit manager in west
8  Kansas.  I was there for a year before promoted into
9  HR manager of August of '17.
10    Q.   And what happened when you were promoted
11 to HR manager?  Did you get relocated?
12    A.   Yes.
13    Q.   Where?
14    A.   To Colorado.
15    Q.   And why is that?
16    A.   Because I lived in Kansas before that.
17    Q.   Right.  So you didn't want to be in
18 Kansas?
19    A.   Well, it would have been a long drive to
20 the corporate office every day.
21    Q.   So they moved you because the corporate
22 office is here in Colorado?
23    A.   Correct.
24    Q.   Okay.  And so you became an HR manager in
25 approximately 2017?

Page 17

1     A.   Yes.
2     Q.   Were there any other job titles that
3  you've held at Circle K?
4     A.   Just the two.
5     Q.   And what was the -- what were your
6  primary job duties as an HR manager at Circle K?
7     A.   I supported, roughly, 423 stores in six
8  states.
9     Q.   Which six states?
10    A.   Colorado, New Mexico, Texas, Oklahoma,
11 Kansas, and Missouri.
12    Q.   And what do you mean by support?  What
13 kind of support did you provide?
14    A.   Answered questions regarding HRIS
15 systems, did investigations, did approvals as far as
16 corrective actions, terminations, helped with
17 on-boarding, helped with training.  I pretty much
18 did everything.
19    Q.   Sounds like a busy job.  What was your
20 salary when you were an HR manager, and did that
21 change over time?
22    A.   I believe $92,000, roughly.
23    Q.   And did that remain the same from 2017
24 through roughly 2021?
25    A.   Usually a 3 percent increase every year.

Page 18

1   Q.   Were you making over six figures by the
2   time you left Circle K?
3   A.   No.
4   Q.   And you said you were in charge of, like,
5   training.  What types of trainings were you in
6   charge of when you were HR manager at Circle K?
7   A.   I launched our new HRIS system and
8   Workday and trained everyone from store managers,
9   market managers, regional directors, CEO, and
10  everybody at the business office on how to use it,
11  clocking in and out, doing corrective actions,
12  position management.  Anything that had to do with
13  that new HRIS system I trained on.
14  Q.   Just to clarify for the record.  HRIS is
15  Human Resources Information System?
16  A.   Yes.
17  Q.   Did you ever do any training for hourly
18  employees?
19  A.   No.
20  Q.   So just, like, store managers, et cetera?
21  A.   Correct.
22  Q.   Did you have any role in developing or
23  revising any employment policies at Circle K while
24  you were the HR manager?
25  A.   A little.

Page 19

1   Q.   Okay.  Can you describe that for me,
2   please?
3   A.   Such as Colorado's termination time for
4   payment is different than Texas, Oklahoma,
5   everywhere because you have to pay them within
6   24 hours if we terminate them.  The same as
7   New Mexico, it had to be within seven days.  I was
8   implementing some of that into our policy because it
9   was not a Circle K policy.  It was a state specific.
10  So some of those types of policies I helped revise.
11  Q.   Okay.  So some of Circle K's policies
12  took into account, you know, local state laws?
13  A.   Correct.
14  Q.   And varied from state to state?
15  A.   Yes.
16  Q.   And you said you had a -- did you have --
17  you said you had a role in, I believe you said,
18  approving terminations.  Could you tell me about
19  that?
20  A.   When an employee would be terminated, the
21  store manager or district manager would input that
22  into the HRIS system, and it would actually come to
23  my inbox for approval or denial, depending on if I
24  knew any information regarding that or not.
25  Q.   What do you mean if you knew any

Page 20

1   information regarding that or not?  Did you
2   sometimes withhold approval or denial because you
3   didn't have information?
4   A.   I would --
5           MR. CARROLL:  Object to the form of
6   the question.
7   Q.   Go ahead.
8   A.   I would pick up a phone and make a phone
9   call to either the store manager or district manager
10  to find out why we're terminating someone, whether
11  it was no call, call shows, and they didn't put in
12  all the proper information into the system.  I would
13  tell them to go back in and revise it before I would
14  approve it so we would have a good base of
15  information.
16  Q.   Did you ever deny a termination?  I guess
17  a termination -- what would you call them?  Let me
18  step back a little bit.
19          When you got one of these
20  recommendations, did you just call them a
21  recommendation?  What were they?
22  A.   They were terminations.  I mean, even if
23  it was someone that wanted to leave the company
24  themselves, they could write their own termination
25  and then I could approve it.  Or they could ask for

Page 21

1   HR guidance, meaning can you give me a call because
2   I'm quitting because of this or this or this.  You
3   know, whatever that may be.
4   Q.   Okay.  So your role was more about making
5   sure that there was proper documentation?
6   A.   Yes.
7   Q.   Did you ever override a termination?
8   A.   I don't recall.
9   Q.   Would that be something you could have
10  done --
11  A.   I could have.
12  Q.   -- in your role as HR manager?
13  A.   I could have if it was appropriate.
14  Q.   But you don't recall ever doing so?
15  A.   I don't recall.
16  Q.   Any other kind of role in terminations,
17  other than making sure that there was, you know,
18  sufficient documentation in the system?
19  A.   When I -- I could do investigations and
20  direct the store manager or market manager before a
21  termination due to the outcome of the investigation.
22  Q.   Do you recall ever doing that?
23  A.   Yes.
24  Q.   Can you tell me about that a little bit?
25  A.   A lot of them were, whether it was a



Page 30

```
 1  back away, hide, run, secure yourself, lock the door
 2  after they leave kind of thing so that they can't
 3  re-enter the store, and just make sure that they
 4  stay safe.  That was pretty much their biggest step
 5  in that, was staying safe for our employees and our
 6  customers.
 7     Q.   And was this one training or more than
 8  one training?
 9     A.   I believe it was a yearly training.
10     Q.   And who provided that training when you
11  were a multi-unit manager, multi-staff manager?
12     A.   I believe at the time it was my regional
13  director, because we did not have a training
14  department in our division yet.
15     Q.   And who -- what was the name of your
16  regional director?
17     A.   Steve Meadia.
18     Q.   And was this training in person or
19  online?
20     A.   Mine was in person.
21     Q.   Where did it take place, in corporate
22  headquarters?
23     A.   Yes.
24     Q.   Do you recall how long these trainings
25  were, these annual trainings?
```

Page 31

```
 1     A.   Like an hour, I think.
 2     Q.   And were you involved in any way -- and
 3  you didn't receive any additional training as an
 4  HR manager on the robbery policy?
 5     A.   No.
 6     Q.   What about the confront and chase policy,
 7  do you recall any specific trainings on that policy?
 8     A.   Only in conversation with my director.
 9     Q.   I'm sorry, what does that mean?  Can you
10  explain?
11     A.   Meaning Robert Sway and I would have a
12  conversation regarding the policy before we posted
13  it every year, because we posted it near the labor
14  law posters which I was -- that was one of my tasks
15  to update yearly in every store.  So we would have a
16  conversation about what it means, any changes that
17  came across on the policy from our corporate office,
18  and then we would -- I would make sure that they all
19  get posted.
20     Q.   Do you recall any changes to the confront
21  and chase policy while you were the HR manager or a
22  multi-store, multi-unit store manager?
23     A.   I do not recall any.
24     Q.   So it stayed pretty consistent and the
25  same throughout your tenure at Circle K?
```

Page 32

```
 1     A.   Yes.
 2          MR. CARROLL:  Objection.  Form.
 3     Q.   Did you provide any training yourself to
 4  employees on either the robbery policy or confront
 5  and chase policy?
 6     A.   Confront and chase was brought up during
 7  conference calls that I had monthly -- or I'm sorry,
 8  weekly, and then turned into biweekly with regional
 9  directors and multi-unit managers.
10     Q.   So you spoke about the confront and chase
11  policy every other week to managers?
12     A.   I would say it was probably a few times a
13  year when it really became a relevant time, when
14  there were a lot of robberies or issues going on.  I
15  would reiterate what that policy was so that when
16  market managers had their meetings, they should talk
17  about it too with their store managers and then have
18  it trickle down.
19     Q.   Was there a time that you recall there
20  being an uptick in robberies?
21     A.   Usually, yes.  Summertime seems to be a
22  big time for robberies.
23     Q.   And how many -- I mean, as the HR manager
24  at Circle K, how frequently were you confronted with
25  the robberies in the, I think you said, in the 430
```

Page 33

```
 1  some stores that you oversaw?
 2     A.   Yeah, I would say a couple times a week.
 3     Q.   So there were robberies somewhere in your
 4  six-state region a couple times a week?
 5     A.   Yeah, and sometimes more.
 6     Q.   That's quite a bit.
 7     A.   Absolutely.
 8     Q.   Yeah.  So would you say there was -- I
 9  mean, ballpark figure, I guess you were there from
10  2017 to 2021.  How many robberies do you think took
11  place in the territory that you supported?
12     A.   Hundreds.
13     Q.   And how many of those would you say were
14  armed robberies?
15     A.   Maybe half.
16     Q.   So hundreds of armed robberies as well?
17     A.   Yeah.
18     Q.   It's probably a little bit sensitive, but
19  has anybody been injured, while you were the HR
20  manager, on your territory due to an arm robbery?
21     A.   Yes.
22     Q.   Has anyone died?
23     A.   Yes.
24     Q.   How often would you say there were
25  injuries due to armed robberies in your territory
```



9 (Pages 30 to 33)

Page 34

1   while you were an HR manager at Circle K?
2       A.   Maybe a couple hundred.
3       Q.   And while I -- I don't need names and I
4   don't want to pry, how many deaths occurred when you
5   were the HR manager at Circle K due to armed
6   robberies in your territory?
7       A.   Maybe 30.
8       Q.   Wow.  Okay.  So this is a pretty
9   dangerous job, it seems like.
10      A.   Sure.
11      Q.   And how many employees have you
12  terminated -- or did you approve the terminations of
13  at Circle K for violating either the robbery policy
14  or confront and chase policy?
15      A.   Probably close to a hundred.
16      Q.   Was there ever a time while you were HR
17  manager at Circle K when an armed robbery -- well,
18  scratch that.  I'm trying to think of a way to
19  phrase this.
20           Was there ever a time where you
21  found that a termination of an employee who had
22  experienced an armed robbery was not sufficiently
23  documented?
24           MR. CARROLL:  I object to the form of
25  the question.

Page 35

1            MS. HALPERN:  That probably wasn't
2   amazing.  I can try a third time.
3       Q.   Okay.  So in your role approving
4   terminations, was there ever a time where you
5   disagreed with a termination of an employee who
6   experienced an armed robbery?
7       A.   I don't believe so.
8       Q.   And did you review video footage in each
9   and every single one of those hundred or so
10  terminations?
11      A.   Not every one, no.
12      Q.   So in your mind, do you distinguish
13  between the robbery policy and the confront and
14  chase policy?
15      A.   Yes.
16      Q.   Okay.  Could you tell me about, you know,
17  what distinguishes them?
18      A.   Because the robbery policy doesn't
19  necessarily have to include a confront and chase if
20  the employee does not confront or chase the person.
21  So if they comply with the robber and, you know,
22  follow the policy of, you know, contacting the
23  police when it happens and then following the
24  five-minute rule, not having too much money in their
25  cash register, and they just do everything that the

Page 36

1   robber wants, it doesn't have to include a confront
2   and chase.
3       Q.   Okay.  What does the confront and chase
4   policy prohibit?
5       A.   I don't understand what "prohibit" means
6   in that sentence.
7       Q.   Okay. I'll rephrase that.  Sorry.  I'm
8   turning off my Teams, which has started going off.
9            What conduct does the confront and
10  chase policy prohibit an employee from engaging in
11  when there's a robbery?
12      A.   Basically touching the robbery -- the
13  robber, going around the counter to confront or
14  stand up next to, fight them in any way.  Follow the
15  robber, whether it's within the building or outside
16  the store.  Grabbing them in any way, any physical
17  contact, unless of course it's defend.  I think
18  that's it.
19      Q.   You say defend.  What do you mean by
20  that?
21      A.   Meaning if -- if they -- I mean I saw
22  videos where a person would jump over the counter to
23  try to attack someone.  They were obviously allowed
24  to defend themselves.  But I guess that, you know, a
25  defend if they get attacked.

Page 37

1       Q.   And you said you saw video.  In what
2   circumstances was this that you witnessed video
3   where someone defended themselves?
4       A.   If I remember correctly, someone had
5   jumped over the counter because they wanted money or
6   whatever.  So that the robber jumped over the
7   counter and physically started pushing our employee,
8   so he defended himself against being pushed.
9       Q.   How did he defend himself?
10      A.   Placed his arms above his face, was
11  backing up, trying to get away from the robber.  In
12  that instance, he backed up enough to where the
13  robber opened up the register and took the money and
14  left.
15      Q.   So what was the -- what was the defense
16  in that video footage?
17      A.   What do you mean defense?
18      Q.   I think you said defense, like he -- how
19  did he defend himself?
20      A.   By placing his arms up and moving back
21  away from the robber.
22      Q.   Okay.  So let me clarify.  You didn't --
23  you don't recall any footage where somebody actually
24  pushed an attacker?
25      A.   Not clear in my mind, no.  It was mainly



```
                                            Page 38
 1   a -- I mean, there may have been once where they
 2   defended back after being pushed, but I don't recall
 3   specifics.  You know, it was a while ago.
 4       Q.   Sure.  And so then let me go back a
 5   little bit to the confront and chase policy.
 6            You said defend.  What conduct can
 7   an employee engage in to defend themselves under the
 8   confront and chase policy?
 9       A.   They could try to be safe, so defend
10   themselves by running, hiding, going to the office
11   and locking them self in the office.  You know, if
12   there were physical contact, then they could defend
13   themselves from against any physical contact to
14   break away, to get away from the robber.
15       Q.   Could an employee, if there was physical
16   contact, push the robber away?
17       A.   If there was -- if it was the robber came
18   after them first, absolutely, that's defense.
19       Q.   How about could the employee shout at the
20   robber and tell them to go away or leave them alone?
21       A.   Yes, to a point.  If it was a where the
22   robber had confronted them, shouting at them first,
23   they could tell them, you know, stay away from me,
24   put their arms up, back up, but not put their hands
25   on that robber, or just step away.
```

```
                                            Page 39
 1       Q.   Were employees -- were you trained at all
 2   in your role as HR manager on kind of when
 3   self-defense is appropriate under the confront and
 4   chase policy?
 5       A.   I don't recall.
 6       Q.   You don't recall being trained on that?
 7       A.   No.
 8       Q.   Do you know if employees were trained at
 9   all on when self-defense was acceptable under the
10   confront and chase policy?
11       A.   I don't know.  That wasn't my area to
12   train for that.
13       Q.   Did you receive any training when you
14   were a multi-unit store manager on when it was
15   appropriate to engage in self-defense under the
16   confront and chase policy?
17       A.   No.
18       Q.   Do you know if employees were ever told
19   that they were not -- that they were prohibited from
20   telling a robber to leave them alone if they were
21   being robbed?
22       A.   No.
23       Q.   Do you know if employees were trained at
24   all as to when physical self-defense was appropriate
25   or not under the confront and chase policy?
```

```
                                            Page 40
 1       A.   No.
 2       Q.   Are there any circumstances where you
 3   think physical self-defense would have been
 4   appropriate under the confront and chase policy?
 5       A.   I don't know.  It would depend on the
 6   particular situation.
 7       Q.   Yeah, I think that's what I'm asking.  Is
 8   there any situation where you, as the HR manager,
 9   would have thought it was appropriate for there to
10   be physical self-defense under the confront and
11   chase policy?
12       A.   In my head, yes.
13       Q.   Could you describe that for us, please?
14       A.   If the robber or attacker actually
15   physically touched them first, they can, you know,
16   push back to get away from that robber or person.
17       Q.   What if they thought the robber was about
18   to physically touch or attack them?
19       A.   I don't know.  I mean, I don't know.
20       Q.   What if like the attacker lunged at them
21   and they thought they were about to be attacked,
22   could they push back under the confront and chase
23   policy?
24       A.   I believe so.
25       Q.   Does the confront and chase policy, in
```

```
                                            Page 41
 1   terms of what self-defense is allowed, vary from
 2   state to state?
 3       A.   No.
 4       Q.   Does it take into account any state laws
 5   on self-defense, rights to self-defense?
 6       A.   I'm unaware of each of those state laws
 7   anymore, so I don't know.
 8       Q.   But when you were there as the HR
 9   manager, do you know if the confront and chase
10   policy attempted to comply with state laws about
11   self-defense?
12       A.   I don't know if they did or not.
13       Q.   Was there any variation at all in the
14   policy by state --
15       A.   No.
16       Q.   -- that you oversaw?
17       A.   No.
18       Q.   Were you at all, you know, made aware,
19   for example, of Colorado's laws with respect to
20   rights to self-defense when you were the HR manager
21   at Circle K?
22       A.   No.
23       Q.   And so you didn't have that information
24   before reviewing any of the video footage or
25   approving any terminations?
```



Page 70

```
 1  want to ask you, do you know who Mary Ann Moreno is?
 2      A.  I know of the name, not of the individual
 3  person.
 4      Q.  Okay.  Have you ever met Mary Ann Moreno
 5  in person?
 6      A.  No.
 7      Q.  How do you know Mary Ann Moreno's name?
 8      A.  From the video and just from being that
 9  employee.
10      Q.  Do you recall Ms. Moreno's termination?
11      A.  Bits and pieces.
12      Q.  Okay.  Tell me what you recall about her
13  termination.
14      A.  I just remember the reviewing of the
15  video and then having a conversation with Driss
16  regarding her termination and why we're terminating
17  and then approving that termination.
18      Q.  So let me get the order right.  So you
19  remember reviewing video before you talked to -- let
20  me back up.  Scratch that.
21          Who's Driss?
22      A.  Who's Driss?  Is that the question?
23      Q.  Yes.
24      A.  He was the market manager that was one of
25  the supervisors for Ms. Moreno.
```

Page 71

```
 1      Q.  And did you review the video before you
 2  spoke to Driss or after?
 3      A.  I don't recall.
 4      Q.  And you recall approving Ms. Moreno's
 5  termination?
 6      A.  Yes.
 7      Q.  And I think you testified earlier that
 8  you have approved every termination.  Your role is
 9  mostly to make sure there's proper documentation?
10      A.  Correct.
11      Q.  All right.  Why was Ms. Moreno
12  terminated?
13      A.  Are you asking why was she terminated or
14  why --
15      Q.  Yes.  Why?
16      A.  For the confront and chase policy.
17      Q.  For a violation of the confront and chase
18  policy?
19      A.  Yes.
20      Q.  Did you have any other information about
21  Ms. Moreno's career at Circle K at the time you
22  approved her termination?
23      A.  I had access to prior counselings and her
24  bio as far as her profile in the HRIS system, but it
25  did not -- it didn't matter in the one instance that
```

Page 72

```
 1  we were looking at at that time.
 2      Q.  So were any -- was any other -- was any
 3  other facts of her employment considered by you at
 4  the time you approved the termination?
 5      A.  No.
 6      Q.  The sole and only reason Ms. Moreno was
 7  terminated is for allegedly violating the confront
 8  and chase policy?
 9      A.  Correct.
10      Q.  And do you recall that Ms. Moreno was a
11  long-term employee at Circle K?
12      A.  I don't recall.
13      Q.  Was there a lot of turnover for store
14  employees at Circle K?
15      A.  Yes.
16      Q.  How would you describe the turnover
17  rates?
18      A.  The turnover rate was over 200 while I
19  was there.
20      Q.  Over 200 employees left?
21      A.  Every year.
22      Q.  Every year?
23      A.  It was a -- the turnover percent was over
24  200 percent turnover.
25      Q.  And that's in your whole region?
```

Page 73

```
 1      A.  Yes.
 2      Q.  And what do you recall -- well, I think I
 3  asked you this, but now I can't remember.
 4          Do you remember seeing the video
 5  footage first or speaking with Mr. Aamoud first,
 6  Driss Aamoud --
 7      A.  I don't recall.
 8      Q.  -- the order?
 9      A.  Which one, which order it was in.
10      Q.  Okay.  So tell me all the conversations
11  you recall having with Mr. Aamoud about Ms. Moreno's
12  termination.
13      A.  It would have been that time anyway,
14  after I had reviewed the call and every -- or the
15  video and had a conversation, I would have told him,
16  you know, based on the video review, we have come to
17  a consensus that we need to terminate based on the
18  confront and chase.
19      Q.  Can I just ask, because you used the word
20  "would."
21          Do you remember the actual
22  conversation, or you're assuming that's what you
23  would have said?
24      A.  It is the conversation that I always had
25  with market managers when there -- when it was these
```



Page 74

1  kind of circumstances.
2      Q.   But you don't recall the specific
3  conversation with Mr. Aamoud?  You just think --
4      A.   Yeah.
5      Q.   -- it was the same template as it usually
6  was in these situations?
7      A.   Yeah.  It's the same verbiage I use, but
8  I don't remember his specifically.
9      Q.   Yeah.  You beat me to the punch there.
10          Do you recall anything he said to
11 you from this conversation?  And how many
12 conversations were there -- let me back up -- that
13 you recall?
14     A.   I don't know how many conversations.  But
15 one poignant one was the termination.  There could
16 have been others, but I don't recall.
17     Q.   Okay.  So do you remember anything at all
18 that Mr. Aamoud told you when you were discussing
19 Ms. Moreno's termination?
20     A.   No.
21     Q.   Do you recall anything you said to him
22 specifically, not generally what you said in these
23 situations?
24     A.   Not specifically.
25     Q.   Did Mr. Aamoud tell you that he did not

Page 75

1  think that the individual who attacked Ms. Moreno
2  had a knife?
3      A.   I -- I knew nothing about a knife.
4      Q.   You knew nothing about a knife?
5      A.   No.
6      Q.   Okay.  What do you recall when you saw
7  the video footage?
8      A.   I recalled that the guy was asking for
9  cigarettes and he ended up coming around the
10 counter, and she grabbed him instead of backing up
11 out of the way.  And as soon as she touched him,
12 that was violation of the policy.
13     Q.   Do you remember where she was standing in
14 the video footage?
15     A.   In front of the register.
16     Q.   Do you recall how much space she had to
17 maneuver behind -- behind the counter?
18     A.   Yeah.  The whole other register area for
19 register 1 or 2, whichever one it was, she had that
20 whole other area to be able to step back into.
21     Q.   What else do you recall about the video
22 footage?
23     A.   That the guy, after he went to go and
24 grab the cigarettes -- whether or not he got them or
25 not, I don't recall at this time -- ended up just

Page 76

1  walking out the door.  That's what I recalled at the
2  time.
3      Q.   And you were not made aware of the fact
4  that the individual who attacked Ms. Moreno had a --
5  had a knife or more than one knife?
6      A.   No.
7      Q.   Mr. Aamoud did not tell you that?
8      A.   No, not that I recall.
9      Q.   All right.  What else do you remember
10 about Ms. Moreno's termination?
11     A.   Nothing.
12     Q.   Did you do an investigation?
13     A.   I reviewed video as my investigation,
14 along with my director and our loss prevention
15 manager.
16     Q.   Who is the director?  Who was -- what's
17 the name of the director?
18     A.   Robert Sway.
19     Q.   Okay.  And who was the loss prevention
20 individual?
21     A.   Patrick Bresnahan.
22     Q.   What do you recall discussing with them?
23     A.   The video and what we saw individually.
24     Q.   And what did Robert -- I'm sorry, I know
25 you mentioned him a number of times -- Meadia?  What

Page 77

1  was his last name?
2      A.   Robert Sway?
3      Q.   Sway.  Sorry.
4          What did Mr. Sway say?
5      A.   I believe we -- I believe, I don't know
6  for sure.  I believe that we just talked about our
7  vision of what we saw during the video, which we did
8  for all of the videos that all of us would talk
9  about, to come up with the right direction and if
10 any policies had been violated.  So I don't know
11 directly what he had said during our conversation,
12 but the outcome of that conversation was that we
13 agreed that she should be terminated due to the code
14 of conduct -- or not code of conduct, but the
15 confront and chase policy.
16     Q.   And what role did Patrick Bresnahan, I
17 believe you said his name was, for loss prevention,
18 what role did he have?
19     A.   He also watched the video, and he was a
20 third party to that conversation.
21     Q.   Do you recall what he said?
22     A.   Not individually.  Just the outcome from
23 that conversation was to terminate.
24     Q.   Did anyone at all in this conversation
25 talk about the possibility of self-defense?  Did

Page 78

```
 1  that phrase ever come up?
 2      A.   I don't know.
 3      Q.   It may have?  It may not have?
 4      A.   It may have.  It may not have.  I don't
 5  know.  We had many conversations regarding videos
 6  that we had watched on instances like this, so I
 7  don't remember this specific instance.
 8      Q.   So is this a situation where you're
 9  assuming that that's the conversation you would have
10  had because that's the one you typically had, but
11  you don't have a specific memory?
12      A.   Correct.
13      Q.   Did you discuss the video footage with
14  anyone else?
15      A.   Not that I recall.
16      Q.   Did you interview any store employees at
17  the Circle K store where Mary Ann Moreno worked?
18      A.   No, not that I recall.
19      Q.   Did you do anything else to investigate,
20  other than review the video footage?
21      A.   Every time there was a robbery, I would
22  get notified if any money was taken, what
23  merchandise was taken, so that it could be added to
24  whatever report was out there that I would report to
25  my director.
```

Page 79

```
 1      Q.   Anything else you specifically
 2  remember -- well, let me scratch of that.
 3           Anyone else you remember you might
 4  have spoken to about Ms. Moreno's termination?
 5      A.   Our executive director VP maybe, because
 6  it would all depend on the circumstances.  Sometimes
 7  he was notified not necessarily by me, but by my
 8  director, Robert Sway.
 9      Q.   But you don't know if you did or didn't
10  in this situation?
11      A.   I do not know.
12      Q.   And did you make any effort to contact
13  Ms. Moreno?
14      A.   I don't recall, but usually no.
15      Q.   Anything else you remember about
16  Ms. Moreno's termination?
17      A.   No.
18      Q.   Were you made aware at any point in time
19  of the fact that the individual who attacked
20  Ms. Moreno that night at the Circle K store was
21  prosecuted?
22      A.   I was not aware.
23      Q.   Is this the first time you're hearing
24  that?
25      A.   Yes.
```

Page 80

```
 1      Q.   So you'd be surprised to know that he's
 2  in prison?
 3      A.   Yes.
 4      Q.   Would that have changed your assessment
 5  at all of whether Ms. Moreno deserved to be
 6  terminated for what happened?
 7      A.   No.
 8      Q.   Why not?
 9      A.   Because it's an individual,
10  one-moment-in-time situation.  And during that
11  situation, I wouldn't change my mind as to the
12  outcome, regardless of the past history of either of
13  them.  Longevity in the job or -- you know, I don't
14  know who that robber is, so we take the snapshot in
15  time, and this is what happened for that situation.
16      Q.   Sure.  But sitting here today, knowing
17  that he had two knives and was prosecuted for that,
18  would that have changed your opinion back then on
19  whether Ms. Moreno violated the confront and chase
20  policy?
21      A.   No.
22      Q.   Were you ever provided any training at
23  all on, like, victims' rights statutes?
24      A.   No.
25      Q.   Do you know if the confront and chase
```

Page 81

```
 1  policy conformed with any state laws regarding
 2  victims' rights?
 3      A.   I do not know.
 4      Q.   Did you speak to Love Jorgensen at all
 5  about the armed attack on Ms. Moreno?
 6      A.   Not that I'm aware of.
 7      Q.   Any of the other store employees that she
 8  worked with?
 9      A.   Not that I'm aware.
10      Q.   Just Mr. Aamoud?
11      A.   Correct.
12      Q.   And is he the one who initiated
13  communication with you about terminating Ms. Moreno,
14  or is it the other way around?
15      A.   I don't recall the certain circumstance.
16      Q.   This is the only chance I have to ask
17  you, but is there anything else that you remember
18  about Ms. Moreno's termination?
19      A.   No.  I think it was pretty common, as far
20  as when that termination came through, as a normal
21  termination with that result.
22      Q.   And you've -- well, while you were HR
23  manager, you approved every termination that came to
24  you for any reason?
25      A.   From our stores.
```



21 (Pages 78 to 81)