IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-02327-NYW-STV
_____

DEPOSITION OF:   MARY ANN MORENO - April 12, 2023
_____

MARY ANN MORENO,

Plaintiff,

v.

CIRCLE K STORES, INC.,

Defendant.
_____

        PURSUANT TO NOTICE, the deposition of MARY ANN MORENO was taken on behalf of the Defendant at 1900 16th Street, Suite 800, Denver, Colorado 80202, on April 12, 2023, at 9:16 a.m., before Carin C. Geist, Registered Diplomate Reporter and Notary Public within Colorado.

```
 1  your claims here?
 2         A.   Yes.
 3         Q.   Ms. Moreno, did you ever e-mail with
 4  anybody about your termination from Circle K?
 5         A.   No.  I don't even know how to use my cell
 6  phone.
 7         Q.   So is that to say --
 8         A.   No.
 9         Q.   -- you don't know how to e-mail or --
10         A.   I don't know how to e-mail.  I don't know
11  how to text.  I just use it for emergency reasons and
12  only because my daughter insisted on it.
13         Q.   Just a couple more questions in this neck
14  of the woods, ma'am.  Are there any documents out there
15  that you think might relate to your lawsuit here, but
16  you haven't been able to find them?
17              MS. HALPERN:  Object to form.
18         A.   No.
19         Q.   (BY MR. CARROLL)  Okay.  And are there any
20  documents that you have related to this lawsuit or your
21  employment, but you decided not to provide them?
22         A.   No.
23         Q.   Ms. Moreno, are you currently employed?
24         A.   Yes.
25         Q.   Where do you work right now?
```

1     Q. So inventory was, like, one particular
2 week you worked a little bit more?
3     A. For the year, yeah.
4     Q. I used to work retail myself. I know that
5 inventory was always kind of a big, I don't know, black
6 spot on the calendar.
7     A. Yes.
8     Q. And sort of all hands on deck.
9     I'd like to spend a little time talking
10 about the period of time between the end of your
11 employment at Circle K and when you started your job at
12 Dollar Tree.
13     A. Okay.
14     Q. So October of 2020 until January of 2021.
15 Right?
16     A. Yes.
17     Q. Ms. Moreno, what were you doing during
18 that period of time, if anything, to find a new job?
19     A. Looking for a job. I applied at several
20 places. I mean, I would get on my computer, or my
21 daughter would get on the computer because I don't know
22 how to use a computer, and she would help me through
23 them and -- but I never got calls. Dollar Tree was the
24 only one that ever called me.
25     Q. I'm going to ask a few follow-up

1 questions, as you might expect.  You said you were
2 looking for jobs.  You said you applied for jobs.  What
3 did you do to look for jobs?
4       A.   Well, I would -- when it would come up,
5 like, for instance, Walmart, I want to say.  It would
6 come up.  It would ask me questions like my birthday,
7 my name, my experiences.  I don't think it asked me for
8 wages.
9       Q.   Sounds like you're describing, like, the
10 application for Walmart for --
11       A.   Yeah, it was an application.
12       Q.   You said it would come up.  My question is
13 kind of going back a step or two, which is, how did you
14 find out about that opportunity in the first place?
15       A.   Because Walmart's always hiring.  They're
16 always hiring people or -- and, really, I didn't know
17 if any of these jobs were hiring, but I took a chance.
18       Q.   So is it the case that you weren't looking
19 for jobs that were hiring, but rather, applying at
20 places that you thought might be hiring?
21            MS. HALPERN:  Object to form.
22       A.   Yes.
23            MR. CARROLL:  What's the objection?
24            MS. HALPERN:  I mean, she just said they
25 were going online and looking on the internet, and she

```
 1  said that her daughter was helping her.
 2              MR. CARROLL:  Fair enough.
 3        Q.   (BY MR. CARROLL)  Let me be very clear
 4  here, and we'll separate things out between you and
 5  your daughter, okay?  Let me start with you.  Did you
 6  do anything after your employment with Circle K
 7  ended -- well, let me phrase it differently.
 8              What did you do in order to find a new
 9  job?  And we'll talk about your daughter in a minute.
10        A.   I don't think -- I didn't go out, you
11  know, personally because I don't drive that much, and I
12  have a fear of driving, so I really didn't go out.
13  That's why we -- my daughter helped me on the computer.
14        Q.   Okay.  I'll come back to your daughter.
15  Let me just focus still on you for a little while.  I
16  understand you didn't go out.  Did you maybe look at
17  the want ads in the newspaper, for example?
18        A.   Did they still have newspapers?  I don't
19  know.  No, I didn't.
20        Q.   Okay.  And did you maybe, like, go
21  anywhere on the internet and find out, you know, who's
22  trying to hire right now, who's posting a job?
23        A.   Well, my daughter did.  I didn't.
24        Q.   All right.  So let's go back to your
25  daughter, then, or move to your daughter.  To your
```

1   knowledge, what did your daughter do to help you find a
2   job after your Circle K employment ended?
3           A.   She got on the computer and pulled up a
4   bunch of businesses or -- I've always worked retail
5   since I was 17, so that's the type of job I was looking
6   for, or even just a customer rep.  So she would pull up
7   all these businesses, you know, like Hallmark, Walmart,
8   never restaurants, and that's how she would do it.
9           Q.   And am I correct that she would submit an
10  application on your behalf?
11          A.   Well, I would sit there with her and give
12  her all the information, yes.  And then she would type
13  it in or however they do in their computers.
14          Q.   Together, the two of you would complete
15  the information on the computer and then submit an
16  application?
17          A.   Yes.
18          Q.   Okay.  Were you looking for a full-time
19  job or a part-time job?
20          A.   Full-time.  And, actually, at that time, I
21  was looking for whatever I could get at that time.
22          Q.   Understanding that it was your daughter
23  who did a lot of this, as you sit here today, ma'am, do
24  you have any idea how many jobs you applied for?
25          A.   Oh, my God, no.  Maybe ten or more.  I

1  know we went into her computer a couple of times.  I
2  don't remember the number, no.
3          Q.   Did you interview at Dollar Tree?
4          A.   Yes.
5          Q.   Did you interview anywhere else?
6          A.   No.
7          Q.   Did anyone else offer you an interview?
8          A.   No.
9          Q.   Did I hear you correctly that, I think you
10 said something along the lines of, we went in a couple
11 times.  How often were you and your daughter working on
12 this process?  Was it --
13         A.   I think at least once a week, if I
14 remember right.
15         Q.   Okay.  You testified that -- about your
16 driving.  Let me make sure I understand it correctly.
17 Is it that you don't drive, ma'am, or you're just
18 limited in the amount that you drive?
19         A.   I limit my driving because I have a fear
20 of driving.  Let me explain.  When my granddaughter was
21 born, I got a really bad fear of driving.  I don't know
22 why.  So I didn't try to drive.  Like, I don't get on
23 the highways.  If I go somewhere, like to Walmart, I
24 take side roads.  And Walmart's around my block.  My
25 job is, like, 5 miles from my home, so it's a straight

```
 1  shot down 92nd.  It takes me at the most three, four
 2  minutes to get there.  So I go to work.  I come home.
 3  I don't go anywhere.  If I do, my daughter drives.
 4          Q.   So in light of this limitation on your
 5  driving, did that limit the places that you were
 6  applying for another job somehow?
 7          A.   No, not really.
 8          Q.   So despite your own limitations on
 9  driving, you looked for a job really anywhere?  I guess
10  you tell me.  Was there, like, a geographic area where
11  you were looking for jobs?
12          A.   Yeah.  I would say so.
13          Q.   What was it?
14          A.   The geographic area, you know, I live in
15  Westminster.  There's a lot of businesses around me, a
16  lot of stores.  So it was mostly around Westminster,
17  Thornton, that I can recall.
18          Q.   Okay.  Do you drive at night?
19          A.   I have to, yes.
20          Q.   I just wasn't sure if that was one of
21  the -- your limitations on driving.
22          A.   Well, I don't like to drive at night
23  because I have astigmatism, and the lights blind me.
24  So like I said, my job is straight down 92nd.  I live
25  on 92nd.  I go straight down 92nd and back home.  So
```

1  there, and he said, I saw the whole thing.  He says, I
2  called the police.  And he said he went north.
3         Q.   (BY MR. CARROLL)  And you were on --
4         A.   That's what the customer told me.
5         Q.   And you were on the phone while the
6  customer said that to you?
7         A.   With the police, yes.
8         Q.   So the first thing you did when Mr. Wimmer
9  left was call the police, and we just listened to that
10 phone call, right?
11        A.   Right.
12        Q.   What happened next?
13        A.   Let's see.  I walked back in the store,
14 and I was -- I'm sure I was waiting on customers.  And
15 then -- oh, I walked back in the store, called Love.  I
16 think that's what I did.  I called her, and I said,
17 Love, I've just been robbed.  And she said, they take
18 any money?  And I said, no.  And she said, well, it
19 will take me 45 minutes to get there.  She said, call
20 the assistant.  I said, okay.
21             So I called -- why am -- I cannot remember
22 their names, and I worked with them for so long.
23 Amanda.  I called Amanda.  It went to a recording, but
24 I left a message.  Then I tried -- I think I tried
25 calling her a couple times -- again.  No response

1  again.  Then one of the officers -- they were already
2  there.  One of the officers said, let me try to call
3  her, and they tried to call her, and the same thing, no
4  response.
5           Q.   Call whom?  Amanda?
6           A.   I'm sorry?
7           Q.   The officers tried to call whom?  Amanda?
8           A.   Amanda.
9           Q.   Okay.  Please continue.
10          A.   Because Love told me to call Amanda.  And
11 that -- at that same time I was -- the officer was
12 asking me to fill out a report, and I was trying to
13 fill out the report and wait on customers and, you
14 know, back and forth.
15          Q.   Okay.  Let me ask you a few questions
16 about that sequence of events.  In your conversation on
17 the phone with Love Jorgensen, I understand it's your
18 testimony she said it would take her 45 minutes to get
19 there.
20          A.   Yes.
21          Q.   But she was on her way, right?
22          A.   I don't know.  She just said, it will take
23 me 45 minutes to get there.  Call Amanda.
24          Q.   Well, Love did come to the store, right?
25          A.   After I called Driss.

1  A.  I'm not sure.  I think after I told him,
2  am I fired, and he said, I have to get ahold of loss
3  prevention, I'm not sure if he said, I'll call you.  I
4  know I didn't tell him I'd call him.
5  Q.  Okay.  Was your daughter-in-law Bonnie
6  still waiting outside the store when you left?
7  A.  Yes.  She was waiting because she wanted
8  to follow me home.
9  Q.  Did she follow you home?
10  A.  Yes.  I just live around the block.
11  Q.  So we've looked at video, and I've asked
12  you some questions about the robbery itself and the
13  aftermath of the robbery and the people that you called
14  and who came and when you left.  Is there anything
15  about the robbery itself that we haven't talked about
16  or that you think is important?
17       MS. HALPERN:  Object to form.
18  A.  No.
19  Q.  (BY MR. CARROLL)  I just don't always ask
20  the right questions, you know; and before we move on to
21  other things, I want to give you the opportunity.  Is
22  there something about what happened here between the
23  start of the robbery and the time that you left that
24  you haven't had the opportunity to sort of describe
25  here?

```
 1         A.    "He reached behind me, grabbed something
 2   and then left."  I don't know why it's crossed out, but
 3   that's exactly what happened.
 4         Q.    The blue pen, was it -- you crossed it out
 5   for some reason, right?
 6         A.    I don't know if I crossed it out or she
 7   did, or I might have, yes.  It's blue, so most likely
 8   was me.  But I don't know why it's crossed out.
 9         Q.    Okay.  What about those last --
10         A.    I'm not a very good reader, sorry.
11         Q.    That's all right.  We've got plenty of
12   time.  Last few lines on the first page of Exhibit 8
13   beginning with, "The police showed up."  Now, these are
14   crossed out in the red pen.  Do you have any idea why
15   this is crossed out?
16         A.    Jeez, clumsy.  Let me see.  I don't know.
17   I don't know why it's crossed out in red.  Maybe I
18   asked her to cross it out and restart it somewhere
19   else --
20         Q.    Okay.
21         A.    -- on the paperwork, on the --
22         Q.    Okay.  Just one more question here on
23   Exhibit 8, and I'm on the third page.
24         A.    Third page.
25         Q.    Yeah.  It says "Moreno 170" down at the
```

1    A.   No, no, because I'm a healthy person.  I
2  don't even go to the doctor if I have a cold.  Pay them
3  $190, no way.
4             I'm getting a headache.
5             MS. HALPERN:  So you need a break?
6             MR. CARROLL:  Yeah.  I'm getting close.
7  I'm not quite there yet.  I can -- why don't we go off
8  the record for a moment.
9             (Recess taken, 12:13 p.m. to 12:23 p.m.)
10             MR. CARROLL:  We're back on the record.
11    Q.   (BY MR. CARROLL)  Ms. Moreno, do you
12  understand you're still under oath?
13    A.   Yes.
14    Q.   Your attorney mentioned something to me
15  over the break off the record.
16             MR. CARROLL:  And Iris, I'll turn it over
17  to you to provide something.
18             MS. HALPERN:  Yeah, I just want to clarify
19  that Exhibit 9 is not anything that was written for the
20  attorneys or nothing about us, you know, documenting a
21  conversation that we had with Ms. Moreno and then
22  producing it.  So this was -- it's kind of independent
23  and didn't have anything to do with us.
24             THE DEPONENT:  Maybe I was trying to
25  reword it more professionally because I'm not really an

 1  educated person, so maybe I was just trying to rewrite
 2  it more professionally.  I'm just going to say it that
 3  way.  Better wording or something to that effect.
 4         Q.   (BY MR. CARROLL)  Having had the chance to
 5  think about Exhibit 9 a little bit over the break, I
 6  mean, do you have any idea, like, where this came from?
 7  I might note, for example, it sort of feels like it
 8  picks up on --
 9         A.   It looks like my writing, though.  Maybe I
10  was -- like I said, maybe I was trying to rewrite it
11  more professionally?  I really -- it's been 2 1/2
12  years.  I don't remember.
13         Q.   Okay.  Thank you.  So before the break, we
14  were talking about, you know, how you feel like you've
15  been harmed by Circle K's actions.  I'm looking at one
16  of your interrogatory answers here that we received
17  from your lawyer that says, "As a result of her attack
18  and her termination, she struggles with anxiety, fear,
19  nervousness, agitation, and lack of energy."  Is that
20  your position, ma'am?  You're suffering from anxiety,
21  fear, nervousness, agitation, and lack of energy?
22         A.   I'm trying to remember.  I probably was
23  nervous over the robbery and stuff afterwards.  I don't
24  remember.  But I might have had some anxiety.  I get
25  anxiety all the time.  I don't know.  But I don't take

Mary Ann Moreno
April 12, 2023

```
 1                     REPORTER'S CERTIFICATE

 2   STATE OF COLORADO         )
                               )  ss.
 3   CITY AND COUNTY OF DENVER )

 4         I, CARIN C. GEIST, Registered Diplomate Reporter,
     Certified Realtime Reporter, and Notary Public
 5   ID 20054034523, State of Colorado, do hereby certify
     that previous to the commencement of the examination,
 6   the said MARY ANN MORENO was duly sworn or affirmed by
     me to testify to the truth in relation to the matters
 7   in controversy between the parties hereto; that the
     said deposition was taken in machine shorthand by me at
 8   the time and place aforesaid and was thereafter reduced
     to typewritten form; that the foregoing is a true
 9   transcript of the questions asked, testimony given, and
     proceedings had.
10
           I further certify that I am not employed by,
11   related to, nor of counsel for any of the parties
     herein, nor otherwise interested in the outcome of this
12   litigation.

13         IN WITNESS WHEREOF, I have affixed my signature
     this _____ day of _____, 2023.
14
           My commission expires September 15, 2025.
15

16   __X__ Reading and Signing was requested.

17   _____ Reading and Signing was waived.

18   _____ Reading and Signing is not required.

19
                      [signature: Carin C. Geist]
20

21                    _____
                      Carin C. Geist
22                    Registered Diplomate Reporter
                      Certified Realtime Reporter
23

24

25
```