**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 22-cv-02327-NYW-STV

MARY ANN MORENO,

     Plaintiff,

v.

CIRCLE K STORES, INC.,

     Defendant.

---

### MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Circle K's Motion for Summary Judgment ("Defendant's Motion for Summary Judgment") [Doc. 64] and Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion for Summary Judgment") [Doc. 65]. Upon review of the Motions and the related briefing, the applicable case law, and the record before the Court, the Court concludes that oral argument will not materially assist in the resolution of the Motions. For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED as moot**.

### BACKGROUND

This case arises out of the termination of Plaintiff Mary Ann Moreno ("Plaintiff" or "Ms. Moreno") from her employment with Circle K Stores, Inc. ("Defendant" or "Circle K"). *See generally* [Doc. 56]. Ms. Moreno alleges generally that she was "wrongfully and outrageously terminated [from] her employment after she exercised her right to self-defense and self-preservation during an armed robbery while at work." [*Id.* at 1].

Ms. Moreno initiated this lawsuit in the District Court for Jefferson County, Colorado on August 12, 2022. *See* [Doc. 3 at 2]. Defendant removed the case to federal court on September 9, 2022. [Doc. 1]. On July 6, 2023, Ms. Moreno filed her First Amended Complaint and Jury Demand, which asserts two claims arising under Colorado law: one claim for wrongful discharge in violation of public policy, and another claim for intentional infliction of emotional distress and/or outrageous conduct ("IIED"). [Doc. 56 at ¶¶ 90–124]. Ms. Moreno seeks compensatory damages, punitive damages, and other appropriate relief. [*Id.* at 16–17]. Defendant answered the First Amended Complaint on July 18, 2023, raising, inter alia, the affirmative defense of failure to mitigate damages. [Doc. 59 at 13].

Both Parties have filed motions under Rule 56. Defendant seeks summary judgment in its favor on both of Plaintiff's claims "and her prayer for punitive damages," [Doc. 64 at 1], while Ms. Moreno seeks summary judgment in her favor only on Circle K's affirmative defense of failure to mitigate damages, [Doc. 65 at 1]. The Court discusses the Parties' requests below.

## LEGAL STANDARD

Under Rule 56 of the Federal Rule of Civil Procedure, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).

"Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019); *see also Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").  However, the summary-judgment burden slightly differs depending on which party bears the ultimate burden at trial.  A movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's claim.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once this movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  But "if the moving party has the burden of proof [at trial], a more stringent summary judgment standard applies."  *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).  A moving party who bears the burden at trial "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case."  *Id.*

When considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses.  *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008).  At all times, the Court views each Motion in the light most favorable to the nonmoving party.  *Banner Bank*, 916 F.3d at 1326.

## UNDISPUTED MATERIAL FACTS

The below material facts are drawn from the record before the Court and are undisputed unless otherwise noted.

1.      Ms. Moreno worked as an at-will employee for Circle K from October 2004 until October 2020.  [Doc. 64 at ¶¶ 3–4, 61; Doc. 72 at 2, 6; Doc. 64-1 at ¶¶ 9, 12; Doc. 64-10 at 99:10–12].[1]

2.      Circle K maintains a "Confront & Chase Policy" that instructs employees, in pertinent part:  "Do not confront follow, pursue, track, chase, fight or follow [inside and/or outside] any person[s] suspected of shoplifting products and/or cash from the site, beer runs or any other confrontational situation."  [Doc. 64 at ¶ 6; Doc. 72 at 2;[2] Doc. 64-5 at 2 (brackets in original)].  It also states that the "failure to follow" the Policy "will result in immediate termination."  [Doc. 64 at ¶ 6; Doc. 72 at 2; Doc. 64-5 at 2 (emphasis omitted)].

3.      The Confront & Chase Policy was applicable to Ms. Moreno during her employment.  [Doc. 64 at ¶ 5; Doc. 72 at 2; Doc. 64-1 at ¶ 6].

4.      On October 4, 2020, an individual named Tyler Wimmer ("Mr. Wimmer") committed a robbery at Circle K while Ms. Moreno was working.  [Doc. 64 at ¶ 27; Doc. 72 at 3; Doc. 64-11 at 60:10–24].

5.      Mr. Wimmer entered the Circle K store holding two knives.  [Doc. 64 at ¶ 28; Doc. 72 at 3; Doc. 64-11 at 66:22–67:1].  Mr. Wimmer approached the counter and asked

---

[1] When citing to transcripts, the Court cites to the page and line numbers appearing on the original transcript.  In all other instances, the Court cites to the page numbers generated by the CM/ECF system.

[2] Plaintiff attempts to dispute Defendant's assertion that the Confront & Chase Policy contains this language by reproducing the Policy in full.  *See* [Doc. 72 at 2].  However, Plaintiff does not dispute that these pertinent provisions are contained in the Confront & Chase Policy.  *See* [*id.*].  The Court deems this fact undisputed.  Fed. R. Civ. P. 56(e)(2).

for a pack of cigarettes, which Ms. Moreno retrieved; Mr. Wimmer then asked to have the cigarettes for free, and Ms. Moreno declined.  [Doc. 64 at ¶¶ 30–32; Doc. 72 at 3; Doc. 64-11 at 68:2–20].   Thereafter, Mr. Wimmer moved behind the counter and physical contact between Ms. Moreno and Mr. Wimmer was made.  [Doc. 64 at ¶¶ 33–38; Doc. 72 at 3–4; Doc. 64-6 at 6:56:05–20].[3]

6.      Mr. Wimmer then left the store and Ms. Moreno called the police.  [Doc. 64 at ¶ 42; Doc. 72 at 4; Doc. 64-11 at 73:5–12].

7.      Ms. Moreno later advised store manager Love Jorgensen ("Ms. Jorgensen") and market manager Driss Aamoud ("Mr. Aamoud") of the robbery.  [Doc. 64 at ¶¶ 44, 47; Doc. 72 at 4; Doc. 64-11 at 74:12–20, 76:18–25].  Ms. Jorgensen and Mr. Aamoud arrived at the store and reviewed surveillance footage.  [Doc. 64 at ¶¶ 49, 51; Doc. 72 at 4; Doc. 64-12 at 113:11–21].

8.      The next day, on October 5, 2020, Mr. Aamoud, operations director Craig Holmes ("Mr. Holmes"), and human resources manager Amy Harvey ("Ms. Harvey") each reviewed the surveillance video.  [Doc. 64 at ¶ 53; Doc. 72 at 4; Doc. 64-12 at 117:20–25; Doc. 64-13 at 41:12–16, 44:1–8; Doc. 64-14 at 73:10–18].

9.      Mr. Aamoud, Mr. Holmes, and Ms. Harvey all agreed that Ms. Moreno violated Circle K's Confront & Chase Policy during her interaction with Mr. Wimmer and jointly decided to terminate Ms. Moreno's employment for allegedly violating the Confront

---

[3] The Parties largely dispute the events of the robbery.  *See, e.g.*, [Doc. 64 at ¶¶ 33–41; Doc. 72 at 3–4].  These disputes are not material for purposes of this Order.  The Parties do not dispute that Mr. Wimmer came behind the counter and that physical contact between Ms. Moreno and Mr. Wimmer occurred, *see* [Doc. 64 at ¶¶ 33, 36–38; Doc. 72 at 3–4], which is confirmed by the video surveillance footage, *see* [Doc. 64-6 at 6:56:05–20].

& Chase Policy.  [Doc. 64 at ¶¶ 54–55; Doc. 65 at ¶ 31; Doc. 65-8 at 44:1–5; Doc. 72 at 4; Doc. 64-13 at 42:11–44:5, 49:13–50:5; Doc. 70 at ¶ 31].

10.     On October 6 or 7, 2020, Mr. Aamoud called Ms. Moreno to inform her that her employment with Circle K was terminated.  [Doc. 64 at ¶ 61; Doc. 72 at 6; Doc. 64-11 at 58:2–16; Doc. 64-1 at ¶ 12].[4]

11.     After Mr. Aamoud informed Ms. Moreno of Circle K's decision to terminate her, neither Ms. Moreno nor Mr. Aamoud "said anything else after that."  [Doc. 64 at ¶ 62; Doc. 72 at 6; Doc. 64-11 at 90:11–91:5].

12.     Ms. Moreno did not talk to anyone else at Circle K about her termination, her employment, or the robbery.  [Doc. 64 at ¶ 66; Doc. 72 at 6; Doc. 64-11 at 93:9–22].

13.     Neither Mr. Aamoud nor anyone else at Circle K told Ms. Moreno that she should not have called the police or should not have cooperated with the police.  [Doc. 64 at ¶ 67; Doc. 72 at 6; Doc. 64-11 at 93:25–94:9].   In addition, no one at Circle K told Ms. Moreno that she should not cooperate in the criminal prosecution of Mr. Wimmer. [Doc. 64 at ¶ 68; Doc. 72 at 6; Doc. 64-11 at 94:10–20].

---

[4] The Court notes that, in Plaintiff's Motion for Summary Judgment, Ms. Moreno asserts that she was terminated on October 8, 2020.  *See* [Doc. 65 at ¶ 2].  Circle K disputes this assertion, arguing that Ms. Moreno was terminated on October 6 or 7, 2020.  [Doc. 70 at ¶ 2].  Plaintiff did not reply to this asserted dispute.  *See generally* [Doc. 77].  Accordingly, given that Ms. Moreno elsewhere admitted that she was terminated on October 6 or 7, 2020, *see* [Doc. 72 at 6], the Court will assume that she was terminated on one of those dates.  However, the Court does not find that the exact date on which Ms. Moreno was terminated is material for purposes of this Order.

## ANALYSIS

### I.   Wrongful Discharge in Violation of Public Policy

Under the doctrine of at-will employment, employees hired for an indefinite period of time may be terminated at any time, without cause and without notice, and any such termination typically does not give rise to a cause of action.  *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711 (Colo. 1987).  However, an exception to this general rule exists that "allows at-will employees to pursue claims for wrongful discharge if they allege that they were discharged because they engaged in conduct that is protected or encouraged as a matter of public policy."  *Kearl v. Portage Env't, Inc.*, 205 P.3d 496, 498–99 (Colo. App. 2008).  To establish a prima facie case of wrongful termination in violation of public policy, the plaintiff must demonstrate that:

(1)   the employer directed the employee to perform an illegal act as part of the employee's work-related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege;

(2)   the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker;

(3)   the employee was terminated as the result of refusing to perform the act directed by the employer, or because she performed a public duty or exercised an important job-related right or privilege; and

(4)   the employer was aware, or reasonably should have been aware, that its conduct was violative of the employee's legal right or privilege as a worker.

*Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 109 (Colo. 1992); *Donez v. Leprino Foods, Inc.*, No. 19-cv-00285-CMA-NRN, 2020 WL 1914958, at *4 (D. Colo. Apr. 20, 2020), *aff'd*, No. 21-1212, 2022 WL 500549, at *3 (10th Cir. Feb. 18, 2022).

The public policy at issue must be "widely accepted and substantial," must "concern behavior that truly impacts the public," *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540, 552 (Colo. 1997) (quotation omitted), and must be "sufficiently concrete to notify employers and employees of the behavior it requires," *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 525 (Colo. 1996). Whether there exists a "sufficiently clear expression of public policy" is a question of law for the Court. *Kearl*, 205 P.3d at 498. The plaintiff bears the burden of demonstrating that the public-policy exception applies. *Jaynes v. Centura Health Corp.*, 148 P.3d 241, 243 (Colo. App. 2006).

Ms. Moreno contends that Circle K's termination of her employment violated public policy because she was terminated for (1) exercising her right of self-defense and (2) being the victim of a crime. [Doc. 56 at ¶¶ 99–100, 108; Doc. 72 at 12–19]. Circle K contends in its Motion for Summary Judgment that Ms. Moreno cannot succeed on either theory, and thus, it is entitled to summary judgment on her first claim. [Doc. 64 at 12–14]. The Court addresses each theory separately below.

## A.    Self Defense

Ms. Moreno first argues that Circle K wrongfully terminated her in violation of public policy because it terminated her for engaging in her right of self-defense. [Doc. 72 at 12]. Circle K asserts that any such claim is not legally viable because "[s]elf-defense is not a clearly expressed public policy sufficient to support a wrongful-discharge claim." [Doc. 64 at 14]. The Court notes that Ms. Moreno does not assert that Circle K required her to perform an illegal act or prohibited her from performing a public duty (such as jury duty),

*see generally* [Doc. 72];[5] therefore, her claim necessarily involves a contention that Circle K prohibited her from exercising an important job-related right or privilege, *Martin Marietta*, 823 P.2d at 109. "Under this rationale, the employee must prove that the employer's action 'would violate a *specific statute* relating to the public health, safety, or welfare, or would undermine a *clearly expressed public policy* relating to the employee's rights as a worker.'" *Donez*, 2020 WL 1914958, at *5 (quoting *Mariani*, 916 P.2d at 524 (emphasis in original)).

Ms. Moreno contends that "Colorado public policy recognizes the essential right to self-defense," directing the Court to three sources of law: a Colorado statute, the Colorado Constitution, and Colorado case law. [Doc. 72 at 12–13]. First, Ms. Moreno notes that the right to self-defense is "codified at Colo. Rev. Stat. § 18-1-704." [*Id.* at 12]. This statute provides that

> a person is justified in using physical force upon another person in order to defend [her]self or a third person from what [s]he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and [s]he may use a degree of force which [s]he reasonably believes to be necessary for that purpose.

Colo. Rev. Stat. § 18-1-704(1). In addition, she highlights that the Colorado Constitution states that "[a]ll persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and **defending** their lives and liberties . . . and of seeking and obtaining their safety and happiness." [Doc. 72 at 13 (quoting Colo. Const. art. II, § 3 (emphasis in original))]. And third, she relies on the fact that, under Colorado law, Coloradans have the right to "use force in defending [themselves] without

---

[5] *See Martin Marietta*, 823 P.2d at 109 (using jury duty as an example of a public duty or obligation).

first retreating, or seeking safety by means of escape," if they "reasonably perceive[] an imminent use of unlawful physical force."  [*Id.* (quoting *People v. Monroe*, 474 P.3d 113, 116 (Colo. App. 2018))].  Ms. Moreno acknowledges that the Colorado Supreme Court has never ruled that the right to self-defense is a job-related public policy right that, if violated, could form the basis of a wrongful termination claim, but argues that "[i]n light of the clear public policy favoring self-defense[,] . . . the Colorado Supreme Court is likely to recognize such an exception."  [*Id.*].

Where there is no definitive direction from a state's high court on an issue of state law, federal courts applying state law must predict how the state court would rule. *Vanover v. Cook*, 260 F.3d 1182, 1186 (10th Cir. 2001).  As a preliminary matter, the Court notes that while there is limited Colorado case law discussing the public-policy exception to the at-will employment doctrine, the Colorado Supreme Court has expressed reluctance to expand the public-policy exception in the past.  For example, in *Crawford*, the plaintiff alleged that she was terminated in violation of public policy for taking rest breaks according to a Colorado minimum wage order.  *See Crawford*, 938 P.2d at 543, 553.  The wage order dictated that certain employees were eligible to take 10-minute breaks for each four-hour work period.  *Id.* at 553.  The Colorado Supreme Court concluded that the claim was not supported by any "clearly expressed public policy relating to an employee's basic rights or duties," as the wage order "[did] not rise to the level of a public-policy mandate susceptible to private enforcement." *Id.*  In so ruling, the Colorado Supreme Court emphasized that "[t]he [Colorado] General Assembly is the branch of government charged with creating public policies, and the courts may only

recognize and enforce such policies," and instructed that courts "must develop the common law in this area with care." *Id.*

The public-policy exception applies only where an employee's termination "contravenes a *clear mandate* of public policy." *Martin Marietta*, 823 P.2d at 107 (quotation omitted and emphasis added). The Court cannot conclude that the sources cited by Plaintiff, separately or collectively, reflect the sort of *clear* public-policy mandate that "expresse[s] public policy relating to . . . the employee's rights *as a worker*" and is "sufficiently concrete to notify employers and employees of the behavior it requires." *Mariani*, 916 P.2d at 524–25 (quotation omitted and emphasis altered).

Section 18-1-704, found in the Colorado Criminal Code, creates a defense against *criminal* liability where a person acts in self-defense. *See People v. Mosely*, 488 P.3d 1074, 1079 (Colo. 2021). This affirmative defense is available whether or not the person retreated or attempted to seek safety by escape. *Monroe*, 474 P.3d at 116. But the availability of an affirmative defense to a *criminal* charge does not "provide a clear mandate" to employees and employers "to act or not to act in a particular way." *Mariani*, 916 P.2d at 525; *cf. Crawford*, 938 P.2d at 552 (finding the statute the plaintiff relied on to demonstrate a public policy was "factually inapplicable" to the plaintiff's case). Moreover, beyond mentioning that "Colorado has unfortunately experienced a tremendous amount of workplace violence," Ms. Moreno does not explain why her statutory or common-law right to assert self-defense in the criminal context is related to her *job-related* duties at Circle K. *See* [Doc. 72 at 16]; *see also Martin Marietta*, 823 P.2d at 109 (the employee must demonstrate that she was prohibited from "exercising an important *job-related* right or privilege" (emphasis added)). The Court concludes that the

right to self-defense recognized in criminal law lacks a sufficient nexus to Ms. Moreno's job-related rights or privileges, and the generally applicable criminal statute or cases are, at best, only "tenuously connected to [Ms. Moreno's] employment." *See Donez*, 2020 WL 1914958, at *7; *compare id.*, *with Hoyt v. Target Stores, Div. of Dayton Hudson Corp.*, 981 P.2d 188, 191 (Colo. App. 1998) (recognizing a job-related right to be compensated for work performed under the Colorado Wage Claim Act).

The Court reaches the same conclusion with respect to the constitutional provision cited by Plaintiff. The Colorado Constitution recognizes that all persons have "certain natural, essential and inalienable rights," including the right to "defend[] their lives and liberties." Colo. Const. art. II, § 3. But again, this "broad constitutional right[]" is not "'sufficiently concrete to notify employers and employees of the behavior it requires' and do[es] not 'provide a clear mandate to act or not to act in a particular way.'" *Donez*, 2020 WL 1914958, at *7 (quoting *Mariani*, 916 P.2d at 525). Nor does this constitutional provision clearly set forth a *job-related* right or privilege. *See* Colo. Const. art. II, § 3.

"Not all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment." *Crawford*, 938 P.2d at 553. As mentioned above, "[t]he [Colorado] General Assembly is the branch of government charged with creating public policies, and the courts may only recognize and enforce such policies." *Id.* This is particularly true when *federal* courts are asked to recognize a new facet of state law, as it is not the federal judiciary's role to "define the parameters of state public policy." *Brown v. Premier Roofing, LLC*, 173 F. Supp. 3d 1181, 1186 (D. Colo. 2016); *see also Mares v. Conagra Poultry Co.*, 773 F. Supp. 248, 252 (D. Colo. 1991) (recognizing that the role of federal courts "does not include effecting a dramatic shift in the forum state's common

law" and declining to "create a new category within this narrow [public-policy] exception for plaintiff to maintain her cause of action"), *aff'd*, 971 F.2d 492 (10th Cir. 1992).  Indeed, the out-of-state authorities cited by Plaintiff in support of her argument are cases in which *state* high courts recognized a state-law public-policy exception for self-defense acts. *See Ray v. Wal-Mart Stores, Inc.*, 359 P.3d 614, 636 (Utah 2015); *Feliciano v. 7-Eleven, Inc.*, 559 S.E.2d 713, 722–23 (W. Va. 2001); *cf. Gardner v. Loomis Armored Inc.*, 913 P.2d 377, 386 (Wash. 1996) (recognizing public-policy exception where employee was terminated for defending the safety *of another*); *but see Danny v. Laidlaw Transit Servs., Inc.*, 193 P.3d 128, 144 n.16 (Wash. 2008) (Madsen, J., concurring in part and dissenting in part) ("Specialists in the field point to *Gardner* as an anomaly in that the sources of law relied upon for the public policy impose no duty on either the employer or the employee to engage in, or refrain from, the conduct at issue.").  This Court is simply not in the position to recognize, in the first instance, a new type of public-policy exception to Colorado's at-will employment doctrine.[6]

---

[6] The Court recognizes that Ms. Moreno originally filed her action in state court, where this issue would arguably be better addressed, and the case was removed to federal court by Defendant.  [Doc. 1; Doc. 3].  And although Ms. Moreno asserts in her Response that the Court should "certify this question to the Colorado Supreme Court to decide this important question of Colorado law," [Doc. 72 at 17], this request is not properly before the Court, *see* D.C.COLO.LCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion.  A motion shall be filed as a separate document."); *see also* NYW Civ. Practice Standard 7.1A(a)(6) ("A request for the Court to take action shall NOT be included in a response or reply to the original motion.").  While the Court may sua sponte certify a question of law, *see* Colo. App. R. 21.1(b), it declines to do so, given the lack of argument supporting Ms. Moreno's certification request, *see* [Doc. 72 at 17, 25]; *see also Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988) ("Certification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law."); *Ormsbee Dev. Co. v. Grace*, 668 F.2d 1140, 1149 (10th Cir. 1982) (certification "is to be utilized with restraint and distinction").

As a result, the Court concludes that Plaintiff has not met her burden of demonstrating that a public-policy exception to the at-will employment doctrine applies, so as to overcome the presumption of at-will employment in Colorado. *See Donez*, 2020 WL 1914958, at *7 (concluding there was no public-policy exception under Colorado law with respect to the right of self-defense). Accordingly, Ms. Moreno's wrongful termination claim is not viable to the extent it is based on a self-defense theory, and the Court need not address the Parties' remaining arguments as to whether there are genuine disputes of fact on this portion of the claim. Defendant's Motion for Summary Judgment is, therefore, **GRANTED** with respect to this portion of the claim. *See id.*

### B.    Retaliation Against Crime Victims or Reporters of Crime

In the alternative, Ms. Moreno argues that she was wrongfully terminated because her "rights as a victim of a crime were violated." [Doc. 72 at 17]; *see also* [Doc. 56 at ¶ 100 ("Ms. Moreno's wrongful discharge claim is also simultaneously grounded in her rights as a victim and witness of a crime, including her rights to report a crime and to participate in the investigation and prosecution of the crime, free from retaliation by her employer or anyone else.")]. Circle K contends that it is entitled to summary judgment on this portion of the claim for three reasons: (1) the claim is unavailable because Colo. Rev. Stat. § 24-4.1-303 provides a statutory remedy, [Doc. 64 at 16]; (2) the statutes cited by Plaintiff do not create a clearly defined public-policy exception to at-will employment, [*id.* at 16–17]; and (3) Ms. Moreno has failed to adduce any evidence demonstrating that she was terminated because she was the victim of a crime or reported a crime, [*id.* at 17]. Because the first two arguments require novel determinations of Colorado state law, and because Defendant's third argument is dispositive, the Court limits its analysis to

Defendant's third argument.  Even assuming that Ms. Moreno has articulated a public-policy violation that could give rise to a wrongful discharge claim, she has not put forth sufficient evidence from which a reasonable jury could conclude that she was terminated because she was the victim of a crime or because she reported a crime, and has not established a genuine dispute of fact that precludes summary judgment.

As mentioned above, to prevail on a wrongful discharge claim based on a public-policy violation, the plaintiff must show that she was "terminated . . . *as the result of* performing a public duty or exercising an important job-related right or privilege."  *Donez*, 2020 WL 1914958, at *4 (emphasis added) (citing *Martin Marietta*, 823 P.2d at 102).  This means that the plaintiff must "present evidence that her termination was causally connected to her" exercise of a job-related right or privilege or exercise of a public duty. *Jackson v. Dillard's Dep't Stores, Inc.*, 92 F. App'x 583, 588 (10th Cir. 2003) (applying Colorado law); *see also Wehrley v. Am. Fam. Mut. Ins. Co.*, 513 F. App'x 733, 744 (10th Cir. 2013) (recognizing that a claim alleging wrongful termination in violation of public policy "*at the very least* requires evidence of a causal connection between the exercise of [the employee's] rights and the firing." (emphasis added)).

Ms. Moreno appears to assert two separate theories:  first, she was terminated because she reported a crime, and second, she was terminated because she was the victim of a crime.  *See* [Doc. 72 at 17–19].  As for the first theory, Ms. Moreno argues that "there is ample evidence that Defendant terminated Ms. Moreno for reporting being a victim of a crime to her employer and the police."  [*Id.* at 18].  She points to evidence that,

between 2018 and 2021, Circle K terminated 43 employees across six states[7] for violating the Confront & Chase Policy and argues that this evidence demonstrates that Defendant "systematically fires employees who report crimes." [*Id.* (emphasis omitted)]; *see also* [Doc. 72-14]. She notes that there was "only one confirmed case of an employee" who made physical contact with a robber "who was not terminated as a result of that contact," and that Mr. Holmes did not know of any employees who were not terminated after they made physical contact with a robber. [*Id.*]; *see also* [Doc. 72-13 at 37:20–23, 57:21–58:12].[8]

The Court is respectfully unpersuaded by Ms. Moreno's argument, which ignores one of the required elements of a public-policy wrongful discharge claim: that the employee was fired *because* she exercised a protected job-related right or public duty. *Donez*, 2020 WL 1914958, at *4; *Martin Marietta*, 823 P.2d at 102. The Court notes that the cited evidence does not directly concern or demonstrate any basis for *Ms. Moreno's* termination; on this point, Ms. Moreno relies solely on the fact that *other* employees were terminated for violating the Confront & Chase Policy. *See* [Doc. 72 at 18]. But Ms. Moreno does not explain why any evidence showing that Circle K has terminated other employees for violating the Confront & Chase Policy demonstrates that Circle K terminated those employees for reporting crimes, or terminated Ms. Moreno for reporting a crime. In fact, Ms. Moreno does not direct the Court to any evidence demonstrating

---

[7] The states mentioned are Colorado, New Mexico, Texas, Oklahoma, Kansas, and Missouri, [Doc. 72 at 18], which are the states that Ms. Harvey supported as Circle K's HR manager, *see* [Doc. 65-1 at 77:19–78:12].

[8] Ms. Moreno also asserts that Ms. Harvey stated that she could not remember any employee who made physical contact with an assailant and was not terminated, *see* [Doc. 72 at 10, 18], but the cited evidence does not support this assertion, *see* [Doc. 72-5 at 21:7–15, 35:3–7].

that any of those 43 terminated employees *actually reported* any crime, so as to support her assumption that these employees were really terminated for that reason.  *See generally* [*id.*]; *see also* [Doc. 72-1 at 79:9–12 ("Q.   Okay.   And do you know the circumstances of each of these terminations?  A.  I know they were all chase and confront.  But each individual, I do not.")].

To avoid summary judgment, Ms. Moreno must put furth evidence that is "more than mere speculation, conjecture, or surmise."  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).  Even construing the evidence in the light most favorable to Plaintiff, evidence that other employees were terminated for violating the Confront & Chase Policy, or that Mr. Holmes knew of no employees who were retained after they made physical contact with a robber, does not demonstrate that Ms. Moreno was terminated for reporting a crime.   Absent any evidence demonstrating that Circle K actually possessed this purportedly unlawful motivation, Ms. Moreno has not established a genuine dispute of fact sufficient to defeat summary judgment with respect to causation.  *Cf. Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464, 469 (D. Colo. 1996) (in Title VII discrimination context, granting summary judgment in favor of employer where there was no "evidence that [the employer] *actually possessed* this [unlawful] motive").[9]

---

[9] Ms. Moreno states in her Response that the Honorable Scott T. Varholak, in a hearing on Plaintiff's motion to amend her complaint to add a request for exemplary damages, "stated that, considering that anytime an[] employee makes contact[] with an attacker, even in self-defense, they are terminated, a jury could infer that Circle K terminated employees to keep them from reporting crimes and that there is a chilling effect on reporting crimes."  [Doc. 72 at 19].  For several reasons, this argument does not change the Court's conclusion.  First, Plaintiff does not explain why whether the Confront & Chase Policy has a chilling effect on reporting crime is relevant to whether she has presented evidence that she was terminated for reporting a crime.  *See* [*id.*].  Here, it is undisputed that Ms. Moreno did report the robbery to police.  [Doc. 64 at ¶ 42; Doc. 72 at 4].  Second, at the hearing, Plaintiff argued that she should be permitted to add a claim for exemplary

Ms. Moreno also contends that she was terminated for being a crime victim. [Doc. 72 at 18–19]. She appears to suggest that the mere fact that those 43 employees were terminated for violating the Confront & Chase Policy necessitates a corresponding conclusion that these employees were inherently terminated because they were crime victims, presumably based on the idea that any employee who violates the Confront & Chase Policy, which applies in situations of workplace theft or shoplifting, *see* [Doc. 64-5 at 2], is necessarily the victim of a crime. *See, e.g.*, [Doc. 72 at 19 ("Defendant submits that its agents did not intend to fire [Ms. Moreno] because she was a victim of a crime, but that is not the issue. Circle K is a company with a policy that inherently does this by how the policy is constructed and implemented across the company, and as applied to Ms. Moreno. This is separate and apart from the state of mind of any individual supervisor or manager when implementing the company's directives." (citation omitted))].

Ms. Moreno has not directed the Court to any Colorado wrongful-discharge authority approving a theory of causation that relies not on the employer's actual motive,

---

damages (i.e., that Circle K acted willfully or wantonly) because, inter alia, "Circle K systematically terminates employees who report these attacks, and that has a chilling effect on the employees." [Doc. 61 at 8:9–11]. But whether there is prima facie evidence that Circle K acted willfully or wantonly is an entirely different issue from whether Plaintiff has put forth evidence from which a reasonable jury could conclude that she was terminated for reporting a crime. Furthermore, Judge Varholak concluded at the hearing that a reasonable jury, "*at least at the plausibility of pleading stage, and at least considering* [*Stamp v. Vail Corp.*, 172 P.3d 437, 450 (Colo. 2007)]*'s lenient standard*," could find that Circle K "doesn't want [crimes] reported to the police" or "that there's a chilling effect" against reporting crimes. [Doc. 61 at 19:16–20:2 (emphasis added)]. But he also stated that he "[didn't] think Plaintiff ha[d] presented clear facts at this point that the mere statement or the mere fact that Plaintiff reported the crime led to [her] termination," [*id.* at 18:25–19:2], and that, with respect to whether Circle K terminates employees for reporting crimes, he "[didn't] have good facts on that," [*id.* at 19:16–17]. And finally, again, speculation is insufficient to defeat summary judgment. *Bones*, 366 F.3d at 875.

but on the purported incidental impact of a workplace policy.  Even assuming that all of the employees who violated the Confront & Chase Policy are appropriately considered crime victims, this alone is insufficient to demonstrate, beyond speculation or conjecture, that these employees were terminated *because* they were crime victims, rather than for Policy violations.  *See Bones*, 366 F.3d at 875.  Indeed, despite her assertion that between 2017 and 2021, there were "hundreds of robberies, including armed robberies," at Circle K locations, [Doc. 72 at 10]; *see also* [Doc. 72-5 at 33:8–17], Ms. Moreno has not directed the Court to any evidence that Circle K terminates *all* employees who are victims of a robbery at work—even those employees who do not physically engage the robber and therefore do not violate the Confront & Chase Policy—or any other evidence which might have supported her crime-victims theory of relief.  Simply put, this evidence shows—at most—incidental correlation, not causation, and does not support Ms. Moreno's theory that she was terminated *because* she was a crime victim.  Accordingly, no reasonable jury could conclude, based on this evidence, that Ms. Moreno was terminated because she was the victim of a crime.  Defendant's Motion for Summary Judgment is therefore **GRANTED** with respect to the entirety of Plaintiff's wrongful discharge claim.

## II.    Intentional Infliction of Emotional Distress

Circle K also seeks summary judgment on Plaintiff's IIED claim.  [Doc. 64 at 17–18].  It contends that it is entitled to judgment in its favor because Plaintiff cannot show that her termination was extreme or outrageous as a matter of law.  [*Id.* at 19–23].

To prevail on an IIED claim under Colorado law, Ms. Moreno must demonstrate that (1) Circle K engaged in "extreme and outrageous conduct"; (2) Circle K acted

recklessly or with the intent to cause Ms. Moreno severe emotional distress; and (3) Circle K did cause Ms. Moreno severe emotional distress.  *Green v. Qwest Servs. Corp.*, 155 P.3d 383, 385 (Colo. App. 2006).

"The level of outrageousness required to constitute extreme and outrageous conduct is extremely high."  *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 990 (Colo. App. 2011).  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (quoting Restatement (Second) of Torts § 46 (1965)).  "Proof of the tort of outrageous conduct must consist of either an extreme act, both in character and degree, or a pattern of conduct from which the ineluctable conclusion is the infliction of severe mental suffering was calculated or recklessly and callously inflicted."  *Gard v. Teletronics Pacing Sys., Inc.*, 859 F. Supp. 1349, 1354 (D. Colo. 1994).  Whether the defendant's conduct meets this level of outrageousness is generally a question of fact reserved for the jury, but "it is the initial responsibility of a court to determine whether reasonable persons could differ on the question."  *McCarty v. Kaiser-Hill Co.*, 15 P.3d 1122, 1126 (Colo. App. 2000); *see also Coors Brewing Co.*, 978 P.2d at 665 ("Before permitting a plaintiff to present a claim for outrageous conduct to the jury, the trial court must initially rule on the threshold issue of whether the plaintiff's allegations of outrageous conduct are sufficiently outrageous as a matter of law.").

"It is well-settled under Colorado law that discharge from employment, without more, is not outrageous conduct."  *Morales v. L. Firm of Michael W. McDivitt, P.C.*, 641 F. Supp. 3d 1035, 1039 (D. Colo. 2022) (citing *Grandchamp v. United Air Lines, Inc.*, 854

F.2d 381, 384 (10th Cir. 1988)).   This does not mean, however, that an employer can never be held liable for claims of outrageous conduct arising from the termination of a person's employment.   *See Grandchamp*, 854 F.2d at 385 (applying Colorado law) (collecting cases).   For example, in *Christen-Loper v. Bret's Electric, LLC*, the court concluded that the plaintiff stated a plausible IIED claim where she alleged that her employer knowingly terminated her while she was "lying in a hospital bed after suffering a severe bi-polar episode and under a suicide watch" because the employer "was upset with her for taking time off from work to visit her doctor." 175 F. Supp. 3d 1213, 1226 (D. Colo. 2016).   Or, in *Archer v. Farmer Brothers Co.*, the court concluded that reasonable people could find the defendant's conduct—showing up at the employee's bedside unannounced and terminating the employee five days after the employee had a heart attack, while the employee was lying in bed, partially clothed—was extreme and outrageous.   70 P.3d 495, 500 (Colo. App. 2002), *aff'd*, 90 P.3d 228 (Colo. 2004).   And in *Kirk v. Smith*, the court determined that the plaintiff's IIED claim would survive dismissal where she alleged that one of her supervisors physically assaulted her during the termination.   674 F. Supp. 803, 811 (D. Colo. 1987).

These cases demonstrate that it is not termination itself that amounts to extreme and outrageous conduct, but the manner of the discharge and the employer's related actions.   *Grandchamp*, 854 F.2d at 385; *see also, e.g.*, *LaBrecque v. L3 Commc'n Titan Corp.*, No. 05-cv-00642-REB-MJW, 2007 WL 1455850, at *5 (D. Colo. May 16, 2007) ("[A] termination must be combined with other wrongful behavior, such as a physical assault, or extreme harassment, ridicule, and humiliation to constitute an[] arguable claim of outrageous conduct."), *aff'd sub nom. Sydnes v. United States*, 523 F.3d 1179 (10th

Cir. 2008).  "[I]n order to be liable for the intentional infliction of emotional distress, the defendant's conduct must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct."  *Grandchamp*, 854 F.2d at 383.

Circle K contends that it is entitled to summary judgment on Ms. Moreno's IIED claim because its conduct in terminating her employment was not extreme or outrageous. [Doc. 64 at 19].  According to Circle K, its conduct falls well short of the conduct that other courts, such as the courts in *Archer*, *Christen-Loper*, and *Kirk*, have deemed extreme or outrageous.  [*Id.* at 20].  It contends that Ms. Moreno was terminated after its decisionmakers reviewed security footage and determined that Ms. Moreno violated the Confront & Chase Policy, and that Mr. Aamoud "conveyed the termination decision [to Plaintiff] over the phone in a short and unremarkable conversation."  [*Id.* at 22].  It concludes that "[t]he facts here simply do not rise to the necessary level to survive summary judgment."  [*Id.* at 23].

Ms. Moreno disagrees.  She argues that "Circle K's conduct in terminating Ms. Moreno from her nearly 16-year position after she was robbed at knifepoint was outrageous."  [Doc. 72 at 21]; *see also* [*id.* at 23 (Plaintiff arguing that she has adduced sufficient evidence from which a reasonable jury could conclude that "terminating a long-time employee, especially a 72-year-old woman, for having been the victim of a violent crime while on the job is plainly outrageous.")].[10]  She emphasizes the fact that she was

---

[10] The Court notes that Ms. Moreno also alleges in her Amended Complaint that Circle K acted outrageously by "refusing to timely come to her aid following the armed robbery or assign additional employees to the store" and by "order[ing] Ms. Moreno's daughter[-in-law] to leave the store following the armed robbery."  [Doc. 56 at ¶¶ 117, 119].  However, although Defendant put these allegations at issue in its Motion for Summary Judgment and argued that these allegations do not amount to outrageous conduct, *see* [Doc. 64 at 22], Ms. Moreno raises no argument in her Response with respect to these theories of

terminated just days after she was the victim of an armed robbery, arguing that the robbery "left [her] in a state of heightened vulnerability of which her Circle K managers were aware," [*id.* at 22], and analogizing her case to *Archer*, *Christen-Loper*, and *Kirk*, asserting that these cases and her case all "concern the termination of an employee after their physical safety was threatened," [*id.* at 23].  She also asserts that "the evidence shows that Circle K terminated [her] pursuant to a systematic policy of terminating employees who are victims of workplace violence."  [*Id.* at 22].

It is undisputed that Ms. Moreno was terminated over the phone by Mr. Aamoud on October 6 or 7, 2020, just days after she was the victim of the robbery during her shift.  [Doc. 64 at ¶ 61; Doc. 72 at 6].  It is also undisputed that Mr. Aamoud "told [Ms.] Moreno she was terminated and neither [Ms.] Moreno nor [Mr.] Aamoud said anything else after that," and that Ms. Moreno did not discuss her termination, her employment, or the robbery with anyone else at Circle K.  [Doc. 64 at ¶¶ 62, 66; Doc. 72 at 6].  It is undisputed that Ms. Moreno sought therapy after the robbery, [Doc. 72 at 11; Doc. 79 at 7], and Ms. Moreno has submitted evidence that she feared for her life during the robbery, *see* [Doc. 72-4 at 124:9–18].

Even construing all disputed facts and evidence in Ms. Moreno's favor, the Court cannot conclude that Ms. Moreno has shown that reasonable jurors could find that Defendant's conduct in terminating Ms. Moreno meets the *extremely high* bar of extreme and outrageous conduct.  The termination of a person's employment—even if the

---

relief and does not argue that Circle K is not entitled to summary judgment on any of these theories of relief, *see* [Doc. 72 at 21–23].  Accordingly, the Court deems these theories of relief abandoned.  *See Hinsdale v. City of Liberal*, 19 F. App'x 749, 769 (10th Cir. 2001).

termination is unfair or based in impropriety—does not automatically constitute extreme
and outrageous conduct.  For example, in *Coors Brewing Co.*, an employee was allegedly
fired to cover up the company's pattern of surreptitiously conducting narcotics
investigations of its employees and money laundering.   978 P.2d at 664–65.   The
Colorado Supreme Court, focusing on the allegations about the employer's behavior
toward the employee—and not the employer's alleged criminal conduct—concluded that
the employer's "alleged scapegoating of" the employee did not arise "to the high level of
outrageousness required by [Colorado] case law."   *Id*. at 666.   And in *Cronk v.
Intermountain Rural Electric Association*, one plaintiff alleged that he was terminated for
giving truthful testimony to the Public Utilities Commission, while another alleged that he
was terminated because he asked for a transfer after his supervisor asked him to engage
in illegal activities.  765 P.2d 619, 621 (Colo. App. 1988).  The Colorado Court of Appeals
agreed with the trial court that these allegations failed to describe conduct that was so
outrageous as to go beyond all bounds of human decency.  *Id.* at 624.

Much of Plaintiff's argument focuses on the fact that she was fired shortly after the
robbery.   *See* [Doc. 72 at 21–23].   To be sure, Defendant's termination of Ms. Moreno
just days after the robbery renders this case *somewhat* analogous to *Archer*, where the
plaintiff was terminated five days after suffering a heart attack.   *Archer*, 70 P.3d at 499.
However, the *Archer* court did not find extreme and outrageous conduct based solely on
the short period of time between the plaintiff's heart attack and his termination; rather, it
was the *entirety* of the surrounding circumstances—that the employer was aware the
employee was out on indefinite sick leave; that the employer's agents went searching for
the employee and ended up at his mother-in-law's house, uninvited; that they entered the

home uninvited; that they found the employee lying in bed, partially clothed; and that they did not ask the employee whether he was able to discuss work matters, but instead presented him with termination papers for his initials. *Id.* at 500. Indeed, the court concluded that

> a reasonable person could find that defendants' conduct—barging into a relative's home and, without any prior notice or other consideration, abruptly firing a twenty-two-year employee while he lay in bed, partially undressed, recuperating from what five days earlier had appeared to be a heart attack, and was, in any event, a serious heart condition—so far exceeded the bounds of decency as to be atrocious and utterly intolerable in a civilized community.

*Id.* Even construing all evidence and making reasonable inferences in Plaintiff's favor, *Archer* is distinguishable; Plaintiff has not directed the Court to any evidence of Defendant's conduct during the termination conversation that is analogous to the *Archer* employer's conduct. Rather, it is undisputed that the termination in this case was relayed to Ms. Moreno over the phone and that the conversation ended thereafter. *Cf. Morales*, 641 F. Supp. 3d at 1040 (finding it relevant that the plaintiff was allegedly terminated over the phone, as "[t]here is far less risk of emotional distress occurring over the phone than in person"); *cf. Widdifield v. Robertshaw Controls Co.*, 671 P.2d 989, 991 (Colo. App. 1983) (finding error in submitting the issue of outrageous conduct to the jury where the plaintiff was terminated but "there [was] nothing in the record to indicate that [his] hiring and firing was accompanied by any malice" and instead, the record established that "he was treated with courtesy").

Similarly, the Court is respectfully unpersuaded by Ms. Moreno's reliance on *Kirk*, wherein the plaintiff alleged that one of her supervisors "physically assaulted her and threw her to the ground" when he discovered that she was recording the termination

conversation.  *Kirk*, 674 F. Supp. at 804.  Ms. Moreno insists that this case is analogous to *Kirk* because her physical safety was similarly threatened during the robbery.  [Doc. 72 at 23].  But as Plaintiff acknowledges, *see* [*id.*], unlike *Kirk*, any physical assault in this case is not alleged to be attributable to Defendant.[11]  And finally, the Court cannot conclude that *Christen-Loper* provides much support for Plaintiff's case here.  Plaintiff argues that this case is analogous because "Circle K terminated Ms. Moreno days after she was the victim of a distressing armed robbery, knowing that she was worried about losing her job."  [Doc. 72 at 22].  It is true that "[t]he outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress by reason of some physical or mental condition or peculiarity."  *Zalnis v. Thoroughbred Datsun Car Co.*, 645 P.2d 292, 294 (Colo. App. 1982).  However, Ms. Moreno has not directed the Court to any evidence demonstrating that Circle K, when it terminated Ms. Moreno, knew that Ms. Moreno was "worried about losing her job" or knew that Ms. Moreno was in any sort of particularly vulnerable emotional state at the time of her termination (other than, of course, the fact that Circle K was aware of the robbery, coupled with the readily drawn inference that the victim of a robbery would likely be shaken up by the incident).  *Compare* [Doc. 72 at 21–23], *with Christen-Loper*, 175 F. Supp. 3d at 1226 (finding sufficient allegations of extreme and outrageous conduct where

---

[11] While Plaintiff highlights that the *Kirk* court denied summary judgment *both* to the alleged assailant and to another defendant, *see* [Doc. 72 at 22–23], the Court remains unpersuaded of *Kirk*'s similarity.  The *Kirk* decision is light on detail, but the court stated that both *Kirk* defendants had allegedly "unfairly reprimand[ed]," harassed, and demoted the plaintiff in retaliation for her advocacy of changing the employer's practices and had "engaged in activities designed for the purposes of retaliation and harassment."  *Kirk*, 674 F. Supp. at 804, 811.  The *Kirk* decision does not alter this Court's analysis that Circle K's behavior does not amount to extreme and outrageous conduct.

the plaintiff alleged that the defendant *knew* she was in the hospital after suffering a "severe bi-polar episode and [was] under a suicide watch" when it terminated her for taking medical leave). And any evidence that Ms. Moreno sought therapy *after* the robbery does not show what Defendant knew at the time it fired Plaintiff. *See* [Doc. 72-4 at 118:2–4 (Ms. Moreno stating that she had "some therapy sessions" but not stating when these sessions occurred)].

That Ms. Moreno was terminated so soon after the robbery is undoubtedly regrettable, but the Court cannot conclude that losing one's job in the midst of or immediately after a difficult or traumatic event necessarily renders the termination "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Coors Brewing Co.*, 978 P.2d at 666 (quotation omitted); *cf. Mahl v. Nokia, Inc.*, 212 F. App'x 279, 280–81 (5th Cir. 2006) (applying Louisiana law) (where the plaintiff was terminated "only days after Hurricane Katrina," concluding that "the precise timing [was] unfortunate" but that the termination did not rise to the level of extreme and outrageous conduct); *Varney v. Dustin Harris Novant Health, Inc.*, No. 3:18-cv-00090-GCM, 2019 WL 377795, at *2 (W.D.N.C. Jan. 30, 2019) (applying North Carolina law) (dismissing IIED claim where the plaintiff alleged that she was "a cancer survivor [who was terminated] less than a week after her discharge from the hospital" (quotation omitted)); *Maclin v. A.M. Bus Co.*, No. 04-cv-04176, 2006 WL 463370, at *18 (N.D. Ill. Feb. 22, 2006) (applying Illinois law) ("While Defendants might not have had the best timing with respect to Plaintiff's termination, there simply is nothing extreme and outrageous, in and of itself, about an employer terminating an employee . . . when the employee is . . . going through a difficult time."). Based on the record before the Court,

while a reasonable person could likely conclude that Circle K's decision to terminate Ms. Moreno's employment days after the robbery was "unkind or unfair," *Grandchamp*, 854 F.2d at 383, the Court cannot conclude that a reasonable juror could find that the termination decision was "beyond all possible bounds of decency," "atrocious," or "utterly intolerable in a civilized community," *Coors Brewing Co.*, 978 P.2d at 666 (quotation omitted).  Ms. Moreno has thus not put forth sufficient evidence that Circle K engaged in extreme and outrageous conduct, a necessary element of her IIED claim.  Defendant's Motion for Summary Judgment is respectfully **GRANTED** with respect to Plaintiff's IIED claim.[12]

### III.   Plaintiff's Motion for Partial Summary Judgment

Ms. Moreno seeks summary judgment in this case insofar as Defendant has raised an affirmative defense of failure to mitigate damages.  *See generally* [Doc. 65].  However, because the Court has granted Defendant's Motion for Summary Judgment, no claims (or affirmative defenses) remain in this case.  Accordingly, Plaintiff's Motion for Partial Summary Judgment is respectfully **DENIED as moot**.

### CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)   Circle K's Motion for Summary Judgment [Doc. 64] is **GRANTED**;

---

[12] Having found that summary judgment in Defendant's favor is appropriate for both causes of action, this Court need not address Defendant's argument that it is entitled to summary judgment as to Plaintiff's claim for punitive damages, as punitive damages are a form of relief that is part and parcel of a liability determination, rather than an independent cause of action.  *See Mason v. Texaco, Inc.*, 948 F.2d 1546, 1554 (10th Cir. 1991).

(2)   Plaintiff's Motion for Partial Summary Judgment [Doc. 65] is **DENIED as moot**;

(3)   Judgment is entered in favor of Circle K on each of Plaintiff's claims;

(4)   Circle K is entitled to its costs pursuant to Federal Rule 54(d) and Local Rule 54.1; and

(5)   The Clerk of Court is directed to close this case.


DATED:  January 19, 2024                    BY THE COURT:

                                            _____
                                            Nina Y. Wang
                                            United States District Judge